UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

CIV. NO. 1:09-CV-466-JAW

* * * * * * * * * * * * * * * * * *
                                   *
MAINE HUMAN RIGHTS COMMISSION, ET AL, *
                                   *
              Plaintiffs           *
                                   *
     vs.                           *
                                   *
SUNBURY PRIMARY CARE, PA,          *
                                   *
              Defendant            *
                                   *
* * * * * * * * * * * * * * * * * *


DEPOSITION OF: JOHN WILLIAM STEPHENS, PA-C


BEFORE: Lisa Fitzgerald, Notary Public, at the offices of Sunbury Primary Care, PA, 133 Corporate Drive, Bangor, Maine on April 13, 2010, beginning at 2:42 p.m.


John P. Gause, Esq.                    For the Plaintiffs
M. Elizabeth Gallie, Esq.

Robert C. Brooks, Esq.                 For the Defendant


Pieske Reporting
(207) 622-1616

```
 1          (This deposition was taken before Lisa Fitzgerald,
 2     Notary Public, at the offices of Sunbury Primary Care,
 3     PA, 133 Corporate Drive, Bangor, Maine on April 13,
 4     2010, beginning at 2:42 p.m.)
 5                        * * * * *
 6          (Also present at the deposition was David Savell.)
 7                        * * * * *
 8          (The deponent was administered the oath by the
 9     Notary Public.)
10                        * * * * *
11   JOHN WILLIAM STEPHENS, PA-C, called, after having been duly
12   sworn on his oath deposes and says as follows:
13                          EXAMINATION
14   BY MR. GAUSE:
15   Q.   Could you state your full name for the record.
16   A.   Sure.  John William Stephens.
17   Q.   Where are you currently employed?
18   A.   Sunbury Primary Care, Corinth Family Medicine.
19   Q.   How long have you worked there?
20   A.   1989.  Since 1989.
21   Q.   What is your job there?
22   A.   I'm a physician assistant.
23   Q.   What do you do as a physician assistant?
24   A.   I, on a daily basis, see patients of all ages,
25        pediatrics through geriatrics.
```

1  Q.  So a family practice provider?
2  A.  Yes.
3  Q.  Do you -- you were Shirley Carney's primary care
4      provider?
5  A.  Correct.
6  Q.  Have you had any other patients who are deaf?
7  A.  Not that I recall.
8  Q.  Do you recall the circumstances surrounding Shirley
9      Carney leaving the practice at Sunbury?
10 A.  I recall that she left the practice. I'm not certain,
11     as I haven't spoken to her since she left. I'm not
12     exactly sure why she left.
13 Q.  Do you recall the last time that you saw her in person
14     being August 16 of 2007?
15 A.  I do.
16 Q.  Have you communicated with her in any way since then?
17 A.  I haven't.
18 Q.  What's your understanding of why she left the practice?
19         MR. BROOKS:  Is that asked and answered?
20         MR. GAUSE:  No.
21         MR. BROOKS:  If you know.
22         THE WITNESS:  I'm not certain, honestly, exactly
23     why she left the practice.
24 BY MR. GAUSE:
25 Q.  Okay. Did you ever talk to her about why?

1  Q.  In general or for that appointment in particular?
2  A.  In general I did feel that, and also for that -- I would
3      have also felt the same for that particular visit.
4  Q.  So generally you felt that you could communicate
5      effectively with her without an interpreter?
6  A.  Correct.
7  Q.  How would you do that?
8  A.  We communicated through a number of methods. Primarily
9      our communication consisted of note writing, for
10     example -- backing up just for a moment, we primarily
11     did writing notes but also through lipreading, gestures,
12     those types of things, so I might say what brings you in
13     today. I remember vividly she would be able to answer
14     that.
15     So it would be a combination of different methods.
16 Q.  Prior to August 16 of 2007, did you communicate most of
17     the time without an interpreter with her?
18 A.  I don't recall the exact number; I've had many visits
19     over 12 years with her. It has been a number of years
20     since I've seen her, so sometimes I had an interpreter,
21     sometimes I didn't.
22 Q.  Why did you have an interpreter when you did have one?
23 A.  Sometimes it was prearranged to have an interpreter at
24     the visit.
25 Q.  Was it usually when she requested one?

| | | |
|---|---|---|
| 1 | Q. | Do you take any sort of a history from the patients on a |
| 2 | | regular basis? |
| 3 | A. | Every visit I would take a history.  It's always part of |
| 4 | | your exam.  It maybe brief, it may be detailed, |
| 5 | | depending on what the complaint is. |
| 6 | Q. | So throughout the visit related to hypertension, you |
| 7 | | would also be talking with your patient? |
| 8 | A. | Sure, I would be communicating with her.  I mean, I |
| 9 | | would probably be speaking with her, and if she didn't |
| 10 | | understand what I was saying, or gesture to me -- again, |
| 11 | | we had a very good relationship.  If she didn't |
| 12 | | understand, we'd start writing notes back and forth. |
| 13 | Q. | How long was a typical visit that you had with Shirley |
| 14 | | Carney that did not involve an interpreter? |
| 15 | A. | Probably in the range of a half an hour. |
| 16 | Q. | How long would a comparable visit be with somebody who |
| 17 | | was a hearing patient? |
| 18 | A. | For the same medical problems, traditionally 15 minutes. |
| 19 | Q. | So about twice as long? |
| 20 | A. | Correct. |
| 21 | Q. | The hyperlipidemia -- |
| 22 | A. | Elevated cholesterol. |
| 23 | Q. | What would you typically do for follow-up for that |
| 24 | | condition? |
| 25 | A. | Simply take a history, find out whether there are any |

| | | |
|---|---|---|
| 1 | | conditions? |
| 2 | A. | Sure. |
| 3 | Q. | Did you treat Shirley Carney for her deafness? |
| 4 | A. | I don't believe I treated her for her deafness. |
| 5 | Q. | Did you provide any medical care for her directly |
| 6 | | related to her deafness? |
| 7 | A. | I don't believe so.  I do believe once I may have stated |
| 8 | | a note on her behalf to someone that needed -- a medical |
| 9 | | person -- to confirm she's deaf, but I don't believe -- |
| 10 | | however you define treating, I didn't treat her for her |
| 11 | | deafness like I would her high blood pressure. |
| 12 | Q. | You didn't provide any ongoing medical care for her |
| 13 | | deafness? |
| 14 | A. | Not that I recall. |
| 15 | Q. | Do you have any specialized training in dealing with |
| 16 | | patients who are deaf? |
| 17 | A. | Specialized as in? |
| 18 | Q. | Other than just what you picked up from communicating |
| 19 | | with a patient who is deaf, have you had any training? |
| 20 | A. | I have not had any special training, no. |
| 21 | Q. | Have you had any training at all other than just |
| 22 | | communicating with -- |
| 23 | A. | Specifically for deafness, no. |
| 24 | Q. | Is it fair to say that your ability to determine whether |
| 25 | | someone can effectively communicate is not related to |

```
 1        your medical background?
 2             MR. BROOKS:  Object to form.  Foundation.
 3             THE WITNESS:  I hate to ask you to repeat it again,
 4        but can you give it to me one more time.
 5             MR. GAUSE:  Sure.
 6   BY MR. GAUSE:
 7   Q.   Is it fair to say that your ability to assess someone's
 8        ability to communicate effectively, who is deaf, is not
 9        related to your medical training?
10             MR. BROOKS:  Form.  Foundation.
11             THE WITNESS:  Again, I don't have any special
12        training in assessing deafness.
13   BY MR. GAUSE:
14   Q.   So it's not related to your medical training; correct?
15             MR. BROOKS:  Same objection.
16             THE WITNESS:  Yes.
17   BY MR. GAUSE:
18   Q.   So your ability to make that determination would not be
19        unlike a lawyer's ability to make that determination;
20        correct?
21             MR. BROOKS:  Objection.  Form.  Foundation.  Object
22        to the hypothetical.
23             THE WITNESS:  Just go back over this again because
24        I'm not really feeling comfortable.
25             MR. GAUSE:  Sure.
```

1          THE WITNESS:  I'm not really understanding.
2  BY MR. GAUSE:
3  Q.   Your determination as to whether someone who is deaf can
4       communicate effectively with you is based solely on your
5       interaction with that person; correct?
6  A.   I think it is, yes.  I'd have to say that it's based
7       purely on our -- Shirley and my interaction.
8  Q.   And that interaction would not be unlike the interaction
9       between a lawyer and a client --
10         MR. BROOKS:  Object to form.
11 BY MR. GAUSE:
12 Q.   -- in terms of, you know, transferring information?
13         MR. BROOKS:  Object to the form and foundation.
14      Misstates the prior testimony.
15         MR. GAUSE:  You can answer.
16         MR. BROOKS:  If you understand.
17         THE WITNESS:  I don't have any special training.  I
18      guess the answer would be yes on that.
19 BY MR. GAUSE:
20 Q.   So the -- strike that.
21         Did you talk with anybody at Sunbury at any time
22      about Sunbury's policy relating to providing interpreter
23      services for patients who are deaf?
24 A.   I'm aware of the policy.  I believe it was -- I believe
25      it was presented at a provider meeting if my memory

1   A.   That's correct.
2   Q.   Did you know that -- strike that.
3        Did you know that her primary language was ASL?
4        MR. BROOKS:  Object to form.  Foundation.
5        THE WITNESS:  I was aware that she does know how to
6   sign, if that's what your question is.  Yes.
7   BY MR. GAUSE:
8   Q.   Were you aware that her primary language was American
9   Sign Language --
10       MR. BROOKS:  Same objection.
11  BY MR. GAUSE:
12  Q.   -- and not English?
13       MR. BROOKS:  Same objection.
14       THE WITNESS:  I would say yes.
15  BY MR. GAUSE:
16  Q.   Did you ever make an assessment of her ability to
17  comprehend English?
18  A.   The only assessment that I would have would be based
19  upon our interactions in hand writing notes back and
20  forth.
21  Q.   And your understanding that she understood what you were
22  saying to her and you understood what she was saying
23  based on those written notes; correct?
24  A.   Correct.
25  Q.   Did you ever ask her how she felt communicating with you

```
                                                              23
```

1  with handwritten notes worked for her in terms of
2  communication?
3          MR. BROOKS:  Objection.  Form.
4          MR. GAUSE:  Strike that.
5  BY MR. GAUSE:
6  Q.  Did you ever ask her which method of communication she
7      preferred?
8  A.  I don't recall asking her.
9  Q.  Did you know which method of communication she
10     preferred?
11 A.  I would say I wouldn't because I didn't ask her.
12 Q.  Did you ever ask her whether she felt that she was
13     getting sufficient information through you through
14     handwritten notes?
15 A.  I did not specifically ask her.
16 Q.  Did you ever ask her whether she felt that she was
17     conveying sufficient information to you through
18     handwritten notes?
19 A.  I would say the only way I would be able to assess
20     whether communication, that she was satisfied with that
21     communication, was through the body -- two ways, one
22     through the body of the information that was being
23     written and the second would be gestures.
24          As I mentioned earlier, we had a good rapport, and
25     clearly she can smile, she can interact with me in that

```
 1              regard, so I never had the sense that she was not
 2              satisfied with that information.
 3       Q.     Are you aware that there are different gestures and
 4              facial expressions that people who use ASL use than
 5              people who speak through English use?
 6                     MR. BROOKS:  Object to the form of the question and
 7              foundation.
 8                     THE WITNESS:  No, I'm not aware.
 9       BY MR. GAUSE:
10       Q.     Do you know how long Shirley Carney has been deaf?
11       A.     I'm not certain the exact number of years.  She's been
12              deaf ever -- I believe she was deaf from childhood but
13              I'm not certain of that.
14       Q.     Have you ever known that?
15       A.     Have I ever known?
16       Q.     When she became deaf or when she was deaf?
17       A.     If I did know that, I don't recall it.  Again, it was
18              15-ish years ago when I first saw her.  If I had asked
19              her, I don't recall her answer.
20       Q.     Did you know what her educational background was?
21       A.     No, I don't recall what her education background is.
22       Q.     Did you know whether she went to the Baxter School for
23              the Deaf?
24       A.     I don't believe we ever discussed that.
25       Q.     Do you know what her grade level, reading comprehension
```

```
 1         was in English?
 2    A.   No.
 3    Q.   Did you know what her grade level, writing ability was
 4         in English?
 5    A.   No.
 6    Q.   At the time, do you know whether she typed?
 7    A.   I'd have to say no, I don't know whether she typed or
 8         not.
 9    Q.   Did you ever communicate with her with typewritten
10         notes?
11    A.   I did not, no, and I don't know of any communication
12         typewritten.
13    Q.   Did you ever communicate with her through lipreading?
14    A.   I would say yes.  If you're asking did I feel that
15         Shirley could read my lips, is that what you're asking?
16    Q.   I'm asking if you used lipreading as a method of
17         communication with her?
18    A.   I would say that was part of our communication.
19    Q.   And the other part was handwritten notes?
20    A.   Correct, yes.
21    Q.   And gestures?
22    A.   Yes.
23    Q.   Anything else?
24    A.   No, not that I recall.
25    Q.   Do you know what her ability to understand English
```

| | | |
|---|---|---|
| 1 | | through lipreading is? |
| 2 | A. | Not being trained there, I'm not certain of that. It |
| 3 | | certainly seemed to be -- she seemed to be proficient |
| 4 | | with me in our interactions, but I have not assessed her |
| 5 | | on that, no. |
| 6 | Q. | Was that based on her gestures? |
| 7 | A. | Why don't you go back -- if you don't mind -- to the |
| 8 | | question before that. |
| 9 | Q. | Do you know what her proficiency with lipreading was |
| 10 | | with respect to the ability to understand English? |
| 11 | A. | Oh, lipreading? |
| 12 | Q. | Yes. |
| 13 | A. | No, I don't know. |
| 14 | Q. | So you don't know whether she could understand |
| 15 | | 50 percent of what was spoken through lips or some other |
| 16 | | number? |
| 17 | A. | I don't have an actual percentage of how much she |
| 18 | | understood. |
| 19 | | Back to my -- I believe we had a good rapport and |
| 20 | | if she did not -- it seemed like she did not understand |
| 21 | | what I was saying, she would say no and then she would |
| 22 | | gesture to me, we need to write, which I had always |
| 23 | | brought a notebook into the visits. |
| 24 | | She would write, I would read it, and back and |
| 25 | | forth. |