UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

MAINE HUMAN RIGHTS )
COMMISSION, et al., )
)
       Plaintiffs, )
)
       v. )     1:09-cv-00466-JAW
)
SUNBURY PRIMARY CARE, P.A., )
)
       Defendant. )

**ORDER ON MOTIONS IN LIMINE, TO STRIKE, TO DISMISS
AND FOR SUMMARY JUDGMENT**

This case involves a disability discrimination claim by a deaf patient and the Maine Human Rights Commission (MHRC) against a medical provider. After resolving some preliminary controversies regarding expert witnesses, the Court grants in part and denies in part the provider's dispositive motions. The Court concludes that even if the patient no longer has standing to demand injunctive relief, the MHRC maintains standing to demand it, that the patient has raised genuine issues of material fact as to whether the provider violated the Maine Human Rights Act (MHRA), that the Plaintiffs complied with the conciliation provision of the MHRA, and that the patient has raised genuine issues of material fact as to whether the provider violated the Rehabilitation Act of 1973 (RA). Finally, the Court grants conceded portions of the Plaintiffs' claims.

# I.    STATEMENT OF FACTS

## A.    Procedural History

On July 29, 2009, the MHRC and Shirley Carney filed suit in the Superior Court of Maine, Penobscot County, because Sunbury Primary Care, P.A. (Sunbury) refused to provide her with an American Sign Language (ASL) interpreter during an August 16, 2007 office visit. *Notice of Removal* (Docket # 1) at 1; *Aff. of Robert C. Brooks* (Docket # 3) Attach. 1 ¶¶ 1, 2 (*Compl.*). In the Complaint, the MHRC and Ms. Carney assert violations of the MHRA, 5 M.R.S. § 4551 *et seq.*, and seek compensatory damages and injunctive relief. *Notice of Removal* ¶ 1. Ms. Carney separately alleges violations of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12011 *et seq.*, and the RA, 29 U.S.C. § 701 *et seq.*, and seeks damages and injunctive relief. *Id.* ¶ 1. Finally, she claims Sunbury made billing errors and seeks money "had and received." *Compl.* ¶¶ 35–41. Sunbury removed the case to federal court on September 23, 2009. *Notice of Removal* at 1.

## 1.     The Plaintiffs' Motion to Exclude Expert Testimony

On July 1, 2010, the MHRC moved to exclude testimony by Sunbury's expert, John W. "Dutch" Stephens, P.A. *Pl. MHRC's Mot.* in Limine *to Exclude Test. By Def.'s Expert Witness* (Docket # 31) (*Pl.'s Mot.* in Limine). Sunbury responded on July 23, 2010, and the MHRC replied on August 11, 2010. *Sunbury's Opp'n to Pl. MHRC's Mot.* in Limine *to Exclude Sunbury's Expert Witness Test.* (Docket # 54) (*Def.'s Opp'n to Pl.'s Mot.* in Limine); *Pl. MHRC's Reply Regarding Mot.* in Limine *to Exclude Def.'s Expert Witness* (Docket # 71) (*Pl.'s Mot.* in Limine *Reply*).

## 2.     Sunbury's Motion to Exclude Expert Testimony

On July 2, 2010, Sunbury moved to exclude the expert testimony of the Plaintiffs' expert, Judy Shepard-Kegl, Ph.D. *Def. Sunbury's Mot. to Exclude Expert Test. Under Federal Rules of Evidence 702* (Docket # 46) (*Def.'s Mot to Exclude*). The Plaintiffs responded in opposition on August 11, 2010. *Pl.'s Opp'n to Sunbury's Mot. to Exclude Expert Test.* (Docket # 68) (*Pl.'s Opp'n to Mot. in Limine*). Sunbury replied on September 1, 2010. *Def. Sunbury's Reply to Pl.'s Opp'n to Mot. to Exclude Expert Test. of Judith Shepard-Kegl* (Docket # 80) (*Def.'s Reply to Pl.'s Opp'n to Mot. in Limine*).

### 3. Sunbury's Motion to Strike the Plaintiffs' Supplemental Expert Witness Disclosure

On September 1, 2010, Sunbury moved to strike the Plaintiffs' supplemental expert witness disclosure relating to Dr. Shepard-Kegl's testimony as to the effectiveness of Ms. Carney's communication with Mr. Stephens on August 16, 2007. *Def. Sunbury's Mot. to Strike Pls.' Supplemental Expert Witness Disclosure* (Docket # 81) (*Def.'s Mot. to Strike*). On September 22, 2010, the Plaintiffs filed their opposition to the motion and on October 6, 2010, Sunbury filed its reply. *Pls.' Opp'n to Sunbury's Mot. to Strike Pls.' Supplemental Expert Witness Disclosure* (Docket # 84) (*Pls.' Opp'n to Mot. to Strike*); *Def. Sunbury's Reply to Pls.' Opp'n to Def.'s Mot. to Strike Pls.' Supplemental Expert Witness Disclosure* (Docket # 85) (*Def.'s Mot. to Strike Reply*).

### 4. Sunbury's Motions to Dismiss and for Summary Judgment

On July 2, 2010, Sunbury moved to dismiss the Complaint under Rule 12(b)(1) and (6) and, separately, for summary judgment under Rule 56. *Def.*

*Sunbury's Partial Mot. to Dismiss* (Docket # 47) (*Def.'s Mot. to Dismiss*); *Def.'s Mot. for Summ. J.* (Docket # 48) (*Def.'s Summ. J. Mot.*). On August 11, 2010, Ms. Carney and the MHRC separately responded in opposition. *Pl. Shirley Carney's Opp'n to Def.'s Partial Mot. to Dismiss* (Docket # 60) (*Carney Opp'n to Dismiss*); *Pl. MHRC's Opp'n to Sunbury's Mot. to Dismiss* (Docket # 67) (*MHRC Opp'n to Dismiss*); *Pl. Shirley Carney's Objection to Def.'s Mot. for Summ. J.* (Docket # 59) (*Carney Opp'n to Summ. J.*); *Pl. MHRC's Opp'n to Sunbury's Mot. for Summ. J.* (Docket # 66) (*MHRC's Opp'n to Summ. J.*). On September 1, 2010, Sunbury separately replied. *Def.'s Reply to Pl. Shirley Carney's Opp'n to its Partial Mot. to Dismiss.* (Docket # 75) (*Def.'s Reply to Carney Opp'n to Dismiss*); *Def.'s Reply to Pl. MHRC's Opp'n to Sunbury's Mot. to Dismiss* (Docket # 77) (*Def.'s Reply to MHRC Opp'n to Dismiss*); *Sunbury's Reply to Pl. Shirley Carney's Objection to its Mot. for Summ. .J.* (Docket # 76) (*Def.'s Reply to Carney Opp'n to Summ. J.*); *Def.'s Reply to Pl. MHRC's Opp'n to Sunbury's Mot. for Summ. J.* (Docket # 78) (*Def.'s Reply to MHRC's Opp'n to Summ. J.*).

### B.    Facts[1][2]

---

[1] Following well established summary judgment procedure, Sunbury submitted its statement of material facts, *Def.'s Statement of Material Facts* (Docket # 36) (DSMF), and the Plaintiffs responded with admissions, denials or qualifications, *Pls.' Opposing Statement of Material Facts* (Docket # 61) (POSMF), as well as their own set of additional material facts, *Pls.' Statement of Additional Material Facts* (Docket # 61) (PSAMF). *See* D. Me. Loc. R. 56(b), (c). Sunbury submitted a reply to the Plaintiff's additional statement of material facts. *Defs.' Reply to Pl.'s Statement of Additional Material Facts* (Docket # 79) (DRPSAMF); D. Me. Loc. R. 56(d). However, in a departure from local practice, Sunbury also submitted objections to the Plaintiffs' response to Sunbury's statement of material facts. *Def.'s Objections to Pls.' Opposing Statement of Material Facts* (Docket # 79). As this Court noted recently, "The summary judgment factual exchange stops at the second round, when a nonmoving party admits, denies, or qualifies each entry in the moving party's statement of material facts. The exchange does not, and cannot, extend indefinitely." *Brooks v. Local S7*, Civil No. 07-30-P-S, 2008 WL 4516363, at *4 n.2 (D. Me. Oct. 3, 2008). The Court, therefore, does not consider Sunbury's objections to the Plaintiffs' responses.

### 1. Shirley Carney's Auditory and Communicative Abilities

Shirley Carney, a resident of Etna, Maine, is hearing-impaired. DSMF ¶¶ 2–3; POSMF ¶¶ 2–3. She has been deaf since approximately the age of three. DSMF ¶ 4; POSMF ¶ 4; PSAMF ¶ 149; DRPSAMF ¶ 149. She cannot recall ever being able to hear anything other than loud sounds and has never been able to hear voices. PSAMF ¶ 149; DRPSAMF ¶ 149.

When she was eight years old, Ms. Carney enrolled in the Baxter School for the Deaf, which she attended until she was age seventeen. DSMF ¶ 6; POSMF ¶ 6; PSAMF ¶ 150; DRPSAMF ¶ 150. She did fine academically and could have received her high school diploma if she had stayed in school a few more months. DSMF ¶ 7; POSMF ¶ 7. Ms. Carney's parents and her eight siblings are not deaf. DSMF ¶ 5; POSMF ¶ 5. Ms. Carney communicated with her second husband by sign language.[3] PSAMF ¶ 151; DRPSAMF ¶ 151.

---

[2] Sunbury moves to strike a number of the Plaintiffs' additional facts because they rely on an affidavit of Dr. Shepard-Kegl, whose expert testimony Sunbury challenges. *See Def.'s Mot to Exclude.* For reasons explained *infra*, the Court grants Sunbury's motions to strike to the extent the additional facts rely on testimony by Dr. Shepard-Kegl as to Ms. Carney's reading level, but otherwise denies them.

[3] Sunbury makes a qualified admission to this statement of material fact, pointing to Ms. Carney's deposition testimony that her second husband, to whom she was married for eight months, "could sign pretty well . . . he wasn't as fluent as [she] is, but he could do finger spelling and he knew sign language." PSAMF ¶ 151; DRPSAMF ¶ 151. Sunbury further argues that whether Ms. Carney's second husband was fluent in sign language is immaterial to the issues of this case. DRPSAMF ¶ 151 (citing *O'Brien v. Thunder Bay, Inc.*, No. 07-64-P-H, 2008 WL 4104181, at *1 (D. Me. Aug. 8, 2008), for the proposition that "a fact is material if it has the potential of determining the outcome of the litigation"). The Court disagrees as to the materiality of the signing ability of Ms. Carney's second husband since it is indicative of her preference for and comfort in communicating using sign language. At a minimum, the fact is no less material than the signing ability of Ms. Carney's first husband, which was proffered by Sunbury. *See* DSMF ¶ 8. The Court accepts the Plaintiffs' proffered fact Number 151 with the qualification that her second husband could sign "pretty well" but not as well as she, and that she was married to him for eight months.

To communicate with people by phone, Ms. Carney has used a video phone and Video Relay Service for the past four years. PSAMF ¶ 152; DRPSAMF ¶ 152. The Video Relay Service allows Ms. Carney to have video contact with a sign language interpreter, who then communicates in spoken English with the person Ms. Carney is calling. PSAMF ¶ 152; DRPSAMF ¶ 152. Ms. Carney's native language is American Sign Language (ASL). PSAMF ¶ 153. ASL and English are very different languages, and while Ms. Carney is able to read and write some English, it is difficult or impossible for her to understand much of what she reads and it is often difficult or impossible for her to write in English what she wishes to say.[4] PSAMF ¶ 153.

According to the Plaintiffs, Ms. Carney's speech is insufficient for communication, especially in a medical context. PSAMF ¶ 155; DRPSAMF ¶ 155. Ms. Carney's lip reading is limited; as calculated by Dr. Shepard-Kegl, Ms. Carney can successfully lip read 48 percent of material presented, and can recognize 35 percent of individually presented words and 53 percent of phrases.[5] PSAMF ¶ 162. Overall, without an ASL interpreter, Ms. Carney cannot reliably access content-rich communication situations—those that involve the exchange of detailed information

---

[4] Sunbury moves to strike this statement of fact because "[t]he similarities between ASL and English and the ease with which Carney communicates in English are not relevant, probative or material to the issue of whether Plaintiff was denied access to medical services on August 16, 2007." DRPSAMF ¶ 153. The Court overrules the objection.

[5] Sunbury objects to the Plaintiffs' record citation to Dr. Shepard-Kegl's affidavit and to materiality. DRPSAMF ¶ 162. The Court has already overruled the objection relating to Dr. Shepard-Kegl. *See infra* footnote 2. The Court also overrules the materiality objection.

that is outside of a person's everyday familiar experience.[6]  PSAMF ¶ 164. According to the Plaintiffs' expert, an appointment with a primary care provider is the type of situation likely to involve content-rich communication and it is unlikely she could reliably understand information in such a setting.[7]  PSAMF ¶ 165.

## 2.    Sunbury and the Hearing-Impaired

Before 2007, Sunbury did not maintain a written policy concerning the accommodation of hearing impaired.[8]  DSMF ¶ 13; POSMF ¶ 13.  At the beginning of 2007, Sunbury adopted a written policy providing in part that it would "work cooperatively with hearing-impaired persons to determine whether and what auxiliary aids and services are appropriate to ensure effective communication between [Sunbury] and hearing impaired persons."  DSMF ¶¶ 17–18; POSMF ¶¶ 17–18.  The policy allowed Sunbury to "select and use whatever auxiliary aid or service that it needs to ensure effective communication with hearing impaired persons."  DSMF ¶ 18; POSMF ¶ 18.  When there were several options available, the provider could choose among various alternatives "as long as the result is effective communication."  DSMF ¶ 18; POSMF ¶ 18.  Specifically, as regards lip reading, the Sunbury policy stated that "the provider, after consultation with the

---

[6] Sunbury objects to the Plaintiffs' record citation to Dr. Shepard-Kegl's affidavit and to materiality. DRPSAMF ¶ 164.  The Court has already overruled the objection relating to Dr. Shepard-Kegl.  S*ee supra* footnote 2.  The Court also overrules the materiality objection.

[7] Sunbury objects to the Plaintiffs' record citation to Dr. Shepard-Kegl's affidavit and to materiality. DRPSAMF ¶ 165.  The Court has already overruled the objection relating to Dr. Shepard-Kegl.  S*ee supra* footnote 2.  The Court also overrules the materiality objection.

[8] Sunbury asserts that its practice has been to pay for an interpreter whenever one was requested, DSMF ¶ 13, and that it has always provided an interpreter whenever one was necessary for effective communication, DSMF ¶ 32.  Pointing to Sunbury's denial of an interpreter for Ms. Carney as well as for another deaf patient, Laurel Kelly, the Plaintiffs denied Sunbury's statements of material facts to this effect.  POSMF ¶¶ 13, 32.  Viewing the evidence in the light most favorable to the Plaintiffs for purposes of Sunbury's motions, the Court credits the Plaintiffs' denial.

hearing impaired person will determine whether the medical information is too complex for accurate lipreading to occur." DSMF ¶ 18; POSMF ¶ 18. As regards the use of written notes, the policy provided that "[w]hether or not a provider may rely on written notes (including a computer screen) will depend on the reading level of the hearing-impaired person, along with other considerations." DSMF ¶ 18; POSMF ¶ 18.

### 3. David Savell

Sunbury's CEO is David Savell. DSMF ¶ 1; POSMF ¶ 1. He is responsible for the day-to-day implementation of the policy but does not make the final determination as to whether Sunbury provides an interpreter to a hearing-impaired patient.[9] DSMF ¶ 20; POSMF ¶ 20. The Plaintiffs deny that Mr. Savell defers to the provider's decision as to whether to provide an interpreter, pointing to Sunbury's statement to Laurel Kelly, another deaf patient, when denying her an interpreter: "Any questions please call David Savell." According to the Plaintiffs, this suggests that the final decision was Mr. Savell's. POSMF ¶ 21.

Under Sunbury's policy, it is the healthcare provider's responsibility to determine whether the provider can achieve effective communication with the patient. DSMF ¶ 22; POSMF ¶ 22. In making this determination, the provider would consider whether they have been able to ascertain the patient's chief

---

[9] The Plaintiffs qualify their response to this statement of fact, asserting that "Mr. Savell played a greater role immediately after the introduction of the written policy due to training requirements and the staff wanting to check with him that they were following the policy appropriately." POSMF ¶ 20. The supplied record citation—page 20 of Mr. Savell's deposition—does not support this qualification and the Court accepts Sunbury's statement of material fact. *See* D. Me. Loc. R. 56(c), (f).

complaint, whether they would be able to create a treatment plan, and whether the patient would understand their responsibility under the treatment plan. DSMF ¶ 23; POSMF ¶ 23.

### 4. Shirley Carney's Prior Treatment at Sunbury and Requests for an Interpreter

Sunbury operates Corinth Family Medicine in Corinth, Maine. DSMF ¶ 1; POSMF ¶ 1. Ms. Carney was a patient as Sunbury's Corinth Family Medicine facility from 1992 to August 16, 2007. POSMF ¶ 2. She first sought treatment there on May 28, 1992. DSMF ¶ 33; POSMF ¶ 33; PSAMF ¶ 166; DRPSAMF ¶ 166. Between May 28, 1992, and July 11, 2000, Ms. Carney visited Sunbury approximately twenty-two times. DSMF ¶ 43; POSMF ¶ 43. During twenty of these visits—the first on November 1, 1995—she was treated by John "Dutch" Stephens, a Certified Physician's Assistant, who treated her for high cholesterol, various short-term illnesses, occasional physical pains, prescription of anti-depressant medication, heart disease, hypertension, anxiety, depression, fibromyalgia, and tobacco smoking. DSMF ¶¶ 34, 43; POSMF ¶¶ 34, 43; PSAMF ¶ 167; DRPSAMF ¶ 167. Mr. Stephens was Ms. Carney's primary health care provider for the next twelve years, and as of 2007, he knew more about Ms. Carney's medical history than any other medical provider. DSMF ¶¶ 37, 39; POSMF ¶¶ 37, 39. Mr. Stephens received training on Sunbury's policy of accommodating the hearing-impaired during March 2007. DSMF ¶ 77; POSMF ¶ 77.

When Ms. Carney first started her treatment with Mr. Stephens, there was no interpreter present and Ms. Carney felt that communication was very cumbersome and basic. PSAMF ¶ 168; DRPSAMF ¶ 168. Soon after her first appointment, Ms. Carney wrote to Mr. Stephens that she was not quite "getting it" and needed an interpreter. PSAMF ¶ 169; DRPSAMF ¶ 169. She repeated her request on three to five different occasions. PSAMF ¶ 169; DRPSAMF ¶ 169. She made the request for an interpreter so that she would be able to understand more of what Mr. Stephens was saying and would be able to express herself more clearly. [10] PSAMF ¶ 171; DRPSAMF ¶ 171. Ms. Carney thought that without an interpreter, there were sometimes important things that she could not understand, that she was misunderstood, or that she could not express everything she wanted to say. PSAMF ¶ 171; DRPSAMF ¶ 171.

On January 17, 2001, Sunbury provided Ms. Carney an interpreter for the first time. DSMF ¶ 81; POSMF ¶ 81; DRPSAMF ¶ 169. Between January 17, 2001, and August 16, 2007, Ms. Carney had approximately twenty-six office visits with Mr. Stephens. DSMF ¶ 82; POSMF ¶ 82. Sunbury provided an ASL interpreter for

---

[10] Sunbury posits a qualified objection to this statement of material fact, arguing that Ms. Carney cannot point to any instance of miscommunication, that Mr. Stephens had no concerns about her ability to understand their written communication, that Ms. Carney was capable of communicating any lack of understanding with Mr. Stephens, and that many of the conditions for which Mr. Stephens was treating Ms. Carney did not require the presence of an interpreter. DRPSAMF ¶ 171. All of this is argument about facts. As Sunbury is well aware, the Court in ruling on its motion for summary judgment must view the facts in the light most favorable to Ms. Carney. The Court overrules Sunbury's qualified objection to Plaintiffs' statement of material facts paragraph 171. Sunbury posited objections and denials on similar grounds in response to paragraphs 172, 173, 174, 175, 176, and 178. The Court overrules each of Sunbury's objections and for purposes of its motion for summary judgment strikes its denials to each paragraph. PSAMF ¶¶ 172–76, 178; DRPSAMF ¶¶ 172–76; 178.

seventeen of those visits. DSMF ¶ 82; POSMF ¶ 82. Sunbury never charged Ms. Carney for the ASL interpreter. DSMF ¶ 110; POSMF ¶ 110.

The times when an interpreter was not present were when Ms. Carney scheduled a last-minute appointment or only needed blood drawn.[11] PSAMF ¶ 170; DRPSAMF ¶ 170. When no interpreter was present, there was much less communication between Mr. Stephens and Ms. Carney, and the writing was very limited. PSAMF ¶ 172; DRPSAMF ¶ 172. Conversely, when an interpreter was present, the communication was better and Ms. Carney felt that she learned and understood more about her medical conditions and was better able to take care of herself. PSAMF ¶¶ 172, 173. Ms. Carney says that without an interpreter, it was hard for her to think of how to write what she desired to communicate, and that she felt bad that it took her so long to communicate with Mr. Stephens, and consequently, she would sometimes withhold things she wanted to say and wait for the next appointment when an interpreter was present. PSAMF ¶ 174. Ms. Carney felt that she could communicate adequately with Mr. Stephens with an interpreter but could not do so without one. PSAMF ¶ 178.

On one occasion, December 15, 2006, Ms. Carney spoke with Melissa White in Sunbury's billing department and Ms. White informed her that Sunbury no longer provided interpreter services. DSMF ¶ 25; POSMF ¶ 25. Ms. White told Ms. Carney that Sunbury could no longer afford an interpreter until Ms. Carney paid

---

[11] The Plaintiffs characterize the number of times Sunbury saw Ms. Carney without an interpreter as "few." PSAMF ¶ 170. Sunbury has posited a qualified objection, stating that of twenty-six office visits between January 17, 2001, and August 1, 2007, Sunbury provided an interpreter for seventeen of those visits. DRPSAMF ¶ 170. The Court accepts Sunbury's numbers over the Plaintiffs' characterization.

the money she owed. As a result, Ms. Carney filed a complaint with the MHRC. PSAMF ¶ 190; DRPSAMF ¶ 190. On October 16, 2008, the MHRC issued a Right to Sue letter as to Ms. Carney's charge against Sunbury arising out of the alleged 2006 discrimination. DSMF ¶ 134; POSMF ¶ 134. Sunbury answered the complaint saying that they would provide an interpreter for Ms. Carney's office visit as soon as she took steps to bring her account up to date. PSAMF ¶ 191; DRPSAMF ¶ 191. Mr. Savell later spoke to Ms. White and corrected her misunderstanding of Sunbury's policy. DSMF ¶ 26; POSMF ¶ 26. Ms. Carney has never commenced any litigation against Sunbury relating to the alleged 2006 discrimination. DSMF ¶ 134; POSMF ¶ 134.

Ms. Carney often wrote letters to Mr. Stephens asking about medical issues, which she would fax to him, rather than make an office appointment. DSMF ¶ 41; POSMF ¶ 41. The Plaintiffs attribute this practice to the comfort Ms. Carney felt in being able to remain at home and have the time to consider what she would write and Mr. Stephens' responses. POSMF ¶¶ 41, 73. Mr. Stephens or someone from his office would typically fax his response back to Ms. Carney, occasionally asking follow-up questions. DSMF ¶ 42; POSMF ¶ 42. The written correspondence exists in Ms. Carney's medical chart and most was generated outside of an office visit. DSMF ¶ 73; POSMF ¶ 73. During Ms. Carney's twelve year professional relationship with Mr. Stephens, she was able to successfully communicate through written correspondence on a number of medical topics. DSMF ¶ 78; POSMF ¶ 78.

Mr. Stephens admits that he could communicate effectively with Ms. Carney when an interpreter was present.[12]  PSAMF ¶ 179; DRPSAMF ¶ 179.  When no interpreter was present, Mr. Stephens and Ms. Carney communicated through hand-written notes, gestures, and lip reading.  PSAMF ¶ 180; DRPSAMF ¶ 180.  Without an interpreter, Mr. Stephens acknowledged that communication with Ms. Carney would not be as fluent or fluid.[13]  PSAMF ¶ 181; DRPSAMF ¶ 181.  Once Sunbury started providing an interpreter, Ms. Carney told Mr. Stephens that it was much easier to understand him with an interpreter present, and Mr. Stephens responded that he also understood what she was communicating much better when an interpreter was present.[14]  PSAMF ¶ 183.  Sunbury says that Mr. Stephens was able to use objective measures such as blood tests and physical examinations to ensure that his communication was effective.  PSMF ¶ 80; POSMF ¶ 80.  However, not all of Ms. Carney's medical conditions involved physical examinations or blood tests.  POSMF ¶ 80.

### 5.    Shirley Carney's Requests for an Interpreter for her August 16, 2007 Office Visit

On July 31, 2007, after a series of faxes between Ms. Carney and Mr. Stephens or his medical assistant, Kathleen Francis, regarding blood work, a check-

---

[12] Sunbury objects to this statement as immaterial but otherwise admits it.  DRPSAMF ¶ 179.  The objection is overruled.

[13] Sunbury objects to this statement as immaterial but otherwise admits it.  DRPSAMF ¶ 181.  The objection is overruled.

[14] Sunbury objects to this statement as immaterial and inconsistent with Ms. Carney's deposition testimony and alternatively denies it, pointing to Mr. Stephens' deposition testimony that he did not have any concerns about the ability to communicate without an interpreter.  DRPSAMF ¶ 183.  Because Sunbury did not identify what portion of Ms. Carney's deposition is inconsistent with the statement of fact and because the Court concludes the statement is material, the Court overrules the objection.  The Court also accepts the Plaintiffs' statement of fact over Sunbury's denial because the Plaintiffs are the nonmoving party.

up, prescription renewal and chest pain, Ms. Carney received a fax from Ms. Francis saying that Ms. Carney should schedule an appointment with Mr. Stephens, but that Ms. Carney first needed to contact Sunbury's billing department. DSMF ¶¶ 44–49, 54; POSMF ¶¶ 44–49, 54; PSAMF ¶ 184; DRPSAMF ¶ 184. Ms. Carney responded, asking why she should call the billing department "Cause I do still payment every month to the billing Dept since about 8 mos. ago." PSMF ¶ 49; POSMF ¶ 49. Ms. Francis wrote back that an appointment had been set up with Mr. Stephens for August 16, 2007. PSMF ¶ 49; POSMF ¶ 49.

On August 1, 2007, Ms. Francis received a fax from Ms. Carney asking whether an appointment was available before August 16, 2007, because her chest pain persisted, and stating her need for an interpreter—preferably Suzette Carter. DSMF ¶ 50; POSMF ¶ 50; PSAMF ¶ 185; DRPSAMF ¶ 185. Ms. Francis forwarded Ms. Carney's request to the Office Manager, Gloria Martin, who called Mr. Savell concerning the request. DSMF ¶¶ 51, 105; POSMF ¶¶ 51, 105. Mr. Savell asked Ms. Martin to check with Mr. Stephens to determine whether an interpreter would be required for effective communication to develop a treatment plan and to ensure Ms. Carney's involvement with the plan. DSMF ¶ 106; POSMF ¶ 106. Mr. Savell later spoke to Ms. Martin to confirm that she had spoken to Mr. Stephens. DSMF ¶ 107; POSMF ¶ 107.

Ms. Martin reported to Mr. Savell that Mr. Stephens told her that he could communicate effectively with Ms. Carney. DSMF ¶ 107; POSMF ¶ 107. Mr. Stephens cannot remember being told on August 1, 2007 that Ms. Carney

specifically requested an interpreter for her next office visit, but he does remember being asked if he thought he needed an interpreter to effectively communicate with Ms. Carney. DSMF ¶ 109; POSMF ¶ 109. Mr. Stephens says that he answered "no," that he did not think he needed an interpreter to effectively communicate with her. DSMF ¶ 109; POSMF ¶ 109. Mr. Savell told Ms. Martin that if Mr. Stephens feels that communication can occur, then Sunbury's policy indicates that the provider is the ultimate decision-maker as to whether an interpreter would be provided. DSMF ¶ 107; POSMF ¶ 107. Mr. Savell did not tell anyone whether an interpreter should be provided for Ms. Carney's August 16th visit. DSMF ¶ 107; POSMF ¶ 107. He understood that Ms. Carney was requesting an interpreter for only a single appointment as Sunbury's policy takes an appointment-by-appointment approach. DSMF ¶ 108; POSMF ¶ 108. Ms. Francis responded to Ms. Carney's interpreter request on August 1 by fax, saying that August 16 was the first available appointment, that Ms. Carney should go to the emergency room if her chest pain was getting worse, and that "[a]n interpreter will not be provided by this office but you may bring one on your own if you desire."[15] DSMF ¶ 52; POSMF ¶ 52; PSAMF ¶ 188; DRPSAMF ¶ 188.

---

[15] The parties agree that in early August, Mr. Stephens told Ms. Martin that in general he did not need an interpreter in order to effectively communicate with Ms. Carney. However, they disagree as to whether he told Sunbury that he did not need an interpreter for the upcoming appointment on August 16, 2007. According to Sunbury, "Mr. Stephens concluded that he did not require the assistance of an ASL interpreter to communicate effectively with Ms. Carney during her office visit on August 16, 2007." DSMF ¶ 53. The Plaintiffs make a lengthy and detailed denial, pointing to portions of Mr. Stephens and Mr. Savell's depositions, affidavits by Ms. Carney, John Gause, and Dr. Shepard-Kegl, and Sunbury's answer. POSMF ¶ 53. The dispute is factual and for purposes of ruling on Sunbury's motion, the Court accepts the Plaintiffs' denial.

The parties dispute the reason Ms. Carney requested an interpreter. Sunbury says it was because she wanted to set a precedent to make sure there were interpreters for all future deaf patients. DSMF ¶ 63. Pointing to Ms. Carney's deposition, Sunbury also says that Ms. Carney felt only that she "should" have an interpreter, not that she "must" have one. DSMF ¶ 64. The Plaintiffs respond that this portion of Ms. Carney's deposition recites only part of the reason Ms. Carney is proceeding against Sunbury. POSMF ¶ 63. The Court accepts Ms. Carney's testimony as self-explanatory—Ms. Carney requested an interpreter both to set a precedent, *Deposition of Shirley Carney* 75:9–23 (Docket # 37) (*Carney Dep.*), and because she felt she needed one to communicate with Mr. Stephens. *Id.* 75:9–23, 76:11–16.

### 6. Shirley Carney's August 16, 2007 Office Visit

The last time that Ms. Carney had been seen at Sunbury prior to her August 16, 2007 visit was in June 2006. PSAMF ¶ 202; DRPSAMF ¶ 202. The parties dispute the precise reason for Ms. Carney's August 16 visit. Sunbury says that Ms. Carney requested it "for the purpose of having him check on the same conditions that he had been seeing her for previously": high cholesterol, high blood pressure, and prescription renewal. DSMF ¶ 54. The Plaintiffs agree, but add that she was seeking to have all of her medical conditions checked, including her heart disease, hypertension, high cholesterol, high blood pressure, prescription renewal, tobacco smoking, anxiety, depression, fibromyalgia, chest pain and blood work. [16] POSMF ¶

---

[16] Sunbury objects to this statement as inconsistent with Ms. Carney's deposition testimony and alternatively qualifies it, asserting that many of the conditions for which Mr. Stephens treated Ms.

54; PSAMF ¶ 186. DRPSAMF ¶ 186. Mr. Stephens noted in his office notes for Ms. Carney's August 16, 2007 visit that Ms. Carney needed to refill her medications as they had run out three months before her visit, that her depression was worse without the medications, that Ms. Carney had been complaining of chest pain, and that she had been seen in the emergency room but was too anxious to undergo a stress test. DSMF ¶ 57; POSMF ¶ 57. Sunbury also points to Ms. Carney's deposition testimony that she only wanted to get her medication refilled and says that Ms. Carney's affidavit contradicts her deposition testimony. DSMF ¶ 62; DRPSAMF ¶ 186. The Plaintiffs say that her deposition testimony does not support the conclusion that she only kept her appointment with Mr. Stephens to get her medications refilled, but that she also had questions relating to her other medical issues, including her stress test. POSMF ¶ 62. The Plaintiffs say that Mr. Stephens regarded the visit as an "acute" one. POSMF ¶ 54; PASMF ¶ 204. For purposes of Sunbury's motion for summary judgment, the Court accepts Ms. Carney's statements that she saw Mr. Stephens on August 16, 2007 to address a variety of ailments and to get her prescriptions refilled.

Before the office visit, Mr. Stephens "very likely" reviewed a fax from Ms. Carney addressed to him dated June 11, 2007 that stated: "Dr. Stephens[:] I think I need to see you for Blood work + check up. Also need medicines too[.] Monday till

Carney on August 16 did not require extensive or complicated verbal communication, that Mr. Stephens was able to obtain the appropriate information from Ms. Carney without a translator, that he would not move on from one medical topic unless he felt that he had clearly covered it, and that Ms. Carney's chart listed her chief complaint as "check-up meds and elevated cholesterol." DRPSAMF ¶ 186. Because Sunbury did not identify what portion of Ms. Carney's deposition is inconsistent with the statement of fact, the Court overrules the objection. The Court also rejects Sunbury's qualification because it is addressed elsewhere in its own statement of material facts and the Plaintiffs' response.

now I have left chest pain.  I need to see you as soon as possible.  Thank you[/s/] Shirley Carney."  PSAMF ¶ 194 (brackets in PSAMF); DRPSAMF ¶ 194.  He also very likely saw a reply to Ms. Carney's fax stating "Shirley, Dutch is on vacation this week.  You need to go to the ER for your chest pain!  Sheila."  PSAMF ¶ 195; DRPSAMF ¶ 195.  On July 23, 2007, Mr. Stephens received a fax stating "Dr. Stephens, I was in E.R. last week And they put me Nuclear Cardiology.  I did one last Friday but I was scared of that machine[.]  I couldn't go I have phobia.  So they want me to ask you for medication for relax.  you have to call Dr. Oxley at EMC.  Let me know.  ok.  Thank you[/s/] Shirley Carney."  PSAMF ¶ 196 (brackets in PSAM); DRPSAMF ¶ 196.  Mr. Stephens wrote a prescription on the bottom of this July 23rd fax and Ms. Carney received notice of the prescription by fax on July 24, 2007.  PSAMF ¶ 197; DRPSAMF ¶ 197.  Before the August 16th visit, Mr. Stephens likely reviewed a number of other documents relating to Ms. Carney's need for an office visit and containing a written dialogue with Ms. Carney discussing the nature of her visit to the emergency room.  PSAMF ¶¶ 198–200; DRPSAMF ¶¶ 198–200.

There was no interpreter present during the August 16, 2007 office visit, which made Ms. Carney very angry.  PSAMF ¶ 206; DRPSAMF ¶ 206.  During this visit, as with previous office visits when no interpreter was present, she and Mr. Stephens communicated using a combination of lip reading, gestures and writing— similar to the methods that Ms. Carney used to communicate with her first husband during their ten-year marriage.  DSMF ¶¶ 66, 87; POSMF ¶¶ 66, 87; PSAMF ¶ 207; DRPSAMF ¶ 207.  Ms. Carney cannot remember what she told Mr. Stephens about

her health during the August 16, 2007 visit. [17] DSMF ¶ 58; POSMF ¶ 58; PSAMF ¶ 222; DRPSAMF ¶ 222. Ms. Carney also cannot recall whether she left the office visit with any unanswered questions. DSMF ¶ 69; POSMF ¶ 69. However, she does remember that she did not ask Mr. Stephens all that she wanted to ask him because of the difficulties of communicating without an interpreter.[18] POSMF ¶ 69; PASMF

---

[17] Pointing to Ms. Carney's deposition statement, Sunbury asserts that during her August 16 visit, because she was upset that an interpreter was not present, "there was no reason to tell [Mr. Stephens] anything." DSMF ¶ 61. The Plaintiffs deny this, instead viewing her deposition testimony as supporting the conclusion that, *at the time of her deposition*, there had not been a need to tell Mr. Stephens anything. POSMF ¶ 61. Both Sunbury and the Plaintiffs point to the same portion of Ms. Carney's deposition transcript for support:

> Q. So is it your testimony, Ms. Carney, that you cannot identify a single piece of information that you withheld from Dutch Stephens when you saw him for the last time on August 16, 2007? Yes or no?
> Mr. Gause: Object to form.
> A. Well, there was no interpreter there, so - - I felt really upset, and so there was no reason to tell him anything.
> Q. You're not answering my question, Mrs. Carney. This is a yes or no question. And the question is - - well, I'll just have the reporter read it back just to make sure I've got it correct. (The preceding question was read back by the reporter.)
> Mr. Gause: Object to form.
> A. No.
> Q. Maybe that's a question that was somewhat ambiguous in terms of the no. So the answer is you cannot identify any piece of information that you withheld from Dutch Stephens when you last saw him on August 16, 2007?
> Mr. Gause: Object to form.
> A. I knew that interpreters were not going to be there that day, because - - and at that time is when I decided it was going to be my last appointment with him. And that was very frustrating and very depressing for me, because I knew in advance that there was going to be no interpreter, so – and at that time, I just needed medication refill and I thought well, if I wasn't going to see him for a year, how was I going to get my meds refilled. And if he wasn't going to get me an interpreter, I needed to do that then.

*Dep. of Shirley Carney* at 132:25; 133:1–25; 134:1–8. The Court views Ms. Carney as saying that when there was no interpreter present at the August 16, 2007, office visit, she became frustrated and depressed and decided to limit her visit only to the information necessary to have her prescriptions refilled. Under this view, the Plaintiffs' denial of Sunbury's statement of material fact paragraph 61 is allowed and viewed in the light most favorable for purposes of Sunbury's motion to the Plaintiffs.

[18] Sunbury objects to the Plaintiffs' statements of material fact paragraphs 223 and 224 as immaterial and argues that Ms. Carney's lack of memory cannot create a genuine issue of fact. In the alternative, Sunbury makes a qualified response. DRPSAMF ¶¶ 223–24. The Court overrules Sunbury's objection and rejects Sunbury's qualification because it is addressed elsewhere in its own statement of material facts and the Plaintiffs' response.

¶¶ 223–24; DRPSAMF ¶¶ 223–24.  Although Ms. Carney cannot remember any specific miscommunication with Mr. Stephens, she experienced the same general difficulties communicating with Mr. Stephens that were present in her earlier visits in which an interpreter was not present.  DSMF ¶ 70; POSMF ¶ 70.  Mr. Stephens stated that "if [Ms.] Carney had scheduled an appointment to go over a new constellation of symptoms or issues and she informed me that she might have a difficult time communicating these symptoms to me, as she did on January 7, 2001, then I would very likely conclude that I would need an ASL interpreter to ensure that we communicated effectively about her medical condition.  PSAMF ¶ 203; DRPSAMF ¶ 203.  According to Dr. Shepard-Kegl, Ms. Carney could not have effectively communicated during her August 16, 2007 visit without the assistance of an ASL interpreter.[19]  PSAMF ¶ 187; DRPSAMF ¶ 187.

Many of the conditions for which Ms. Carney was treated did not require extensive or complicated verbal communication; however, nearly all of them required, at a minimum, that Mr. Stephens ask about her medical history.  DSMF ¶ 68; POSMF ¶ 68.  During the office visit, Mr. Stephens performed a routine physical examination during which he evaluated Ms. Carney's respiratory and cardiovascular systems and examined her extremities.  DSMF ¶ 97; POSMF ¶ 97.  None of the actions he performed during this physical examination required any material interaction with, or cooperation by, Ms. Carney.  DSMF ¶ 97; POSMF ¶ 97.

---

[19] Sunbury objects to the Plaintiffs' record citation to Dr. Shepard-Kegl's affidavit and otherwise denies the fact.  DRPSAMF ¶ 187.  The Court has already overruled the objection relating to Dr. Shepard-Kegl.  *See supra* footnote 2.  The Court accepts the Plaintiffs' statement of fact over Sunbury's denial as the Plaintiffs are the non-moving party.

Mr. Stephens developed a treatment plan for Ms. Carney that included (1) refilling prescriptions, (2) referral to Northeast Cardiology Associates for further testing for chest pain, and (3) ordering blood tests to monitor her high cholesterol. DSMF ¶¶ 95, 99; POSMF ¶¶ 95, 99. Ms. Carney successfully followed through on the treatment plan, and her follow-through may have been as good as or better than any hearing-enabled patient of Mr. Stephens. DSMF ¶ 100; POSMF ¶ 100.

Ms. Carney's August 16, 2007 office visit lasted between thirty and sixty minutes.[20] DSMF ¶ 67; POSMF ¶ 67. This is consistent with the usual length of her office visits; however, if an interpreter was present, the visits were shorter. DSMF ¶ 67; POSMF ¶ 67. Visits without an interpreter lasted about twice as long as visits for a comparable hearing-enabled patient. DSMF ¶ 72; POSMF ¶ 72.

Ms. Carney decided upon leaving her August 16, 2007 visit with Mr. Stephens that she would not see him again. DSMF ¶ 60; POSMF ¶ 60; PSAMF ¶ 225. She was never told by anyone at Sunbury that she should find another doctor. DSMF ¶ 103; POSMF ¶ 103. On December 5, 2008, Ms. Carney began seeing Dr. Julie Hicks at Sebasticook Regional Family Care in Carmel, Maine. DSMF ¶ 101; POSMF ¶ 101. Dr. Hicks' office is five minutes away from Ms. Carney's home.

---

[20] Ms. Carney's August 16, 2007 visit lasted between thirty and sixty minutes. DSMF ¶ 67; POSMF ¶ 67; PSAMF ¶ 209; DRPSAMF ¶ 209. The parties disagree about the significance of the length of the visit. Sunbury says that this was about the same length as her other office visits; the Plaintiffs respond that office visits took twice as long when an interpreter was not present. DSMF ¶ 67; POSMF ¶ 67. Sunbury also says that a typical office visit with Ms. Carney without an interpreter lasted approximately thirty minutes, twice as long as for a comparable hearing-enabled patient. DSMF ¶ 72; POSMF ¶ 72; PSAMF ¶ 175. The two somewhat contradictory statements of fact leave the Court unsure as to the precise length of Ms. Carney's typical office visit. Based upon the admitted and qualified statements of fact, the Court accepts that the typical office visit for Ms. Carney was somewhere between thirty and sixty minutes depending on whether an interpreter was present, and that visits without an interpreter lasted twice as long as for a comparable hearing-enabled person.

DSMF ¶ 102; POSMF ¶ 102.  Ms. Carney has no plans to transfer her care from Dr. Hicks.  DSMF ¶ 104; POSMF ¶ 104.

### 7.    The Commission's Action Against Sunbury

Attorney Michael Duddy previously represented Sunbury before the MHRC in connection with a charge filed by Sunbury patient, Ms. Kelly, on November 17, 2006.  DSMF ¶ 132; POSMF ¶ 132.  Attorney Duddy also represented Sunbury in connection with the charge filed by Ms. Carney on January 30, 2007.  DSMF ¶ 133; POSMF ¶ 133.  Both Ms. Kelly and Ms. Carney were represented by Attorney Elizabeth Gallie before the MHRC.  DSMF ¶ 135; POSMF ¶ 135.  On several occasions, Attorney Gallie informed Attorney Duddy that Sunbury's formal written policy regarding accommodation of hearing-impaired patients satisfied applicable law and was therefore "fine."  DSMF ¶ 135; POSMF ¶ 135.

On April 4, 2008, Attorney Duddy served Sunbury's response to Ms. Carney's charge of discrimination relating to the August 1, 2007 events.  DSMF ¶ 136; POSMF ¶ 136.  There was virtually no activity in the case until May 20, 2009, when Attorney Duddy received an e-mail from MHRC investigator, Angela Tizon, notifying him that the case was "running close to the statute of limitations."  DSMF ¶ 136; POSMF ¶ 136.  Investigator Tizon said that she was attempting to gather additional information to make a finding and asked him a number of questions related to Sunbury's position.  DSMF ¶ 136; POSMF ¶ 136.  Attorney Duddy responded on June 2, 2009.  DSMF ¶ 136; POSMF ¶ 136.

On June 5, 2009, the MHRC mailed Attorney Duddy the Investigator's Report summarizing her preliminary investigation and recommended results. DSMF ¶ 137; POSMF ¶ 137. The report recommended that the MHRC find reasonable grounds to believe that Sunbury discriminated against Ms. Carney on the basis of disability by denying her a qualified interpreter on August 16, 2007, and further recommended that conciliation should be attempted pursuant to 5 M.R.S. § 4612(3). DSMF ¶ 137; POSMF ¶ 137. On June 29, 2009, the MHRC voted to accept the Investigator's recommendation and determined that there were "reasonable grounds to believe an unlawful discrimination has occurred." DSMF ¶ 138; POSMF ¶ 138.

On July 1, 2009, the MHRC's Compliance Officer, Fran Davis, wrote to Attorney Gallie requesting a settlement demand as soon as possible in light of the August 1, 2009 statute of limitations. PSAMF ¶ 234; DRPSAMF ¶ 234. The following day, Attorney Gallie wrote back that, "because of the personalities involved," she doubted that a settlement would be reached before the statute of limitations, and that she had previously made an offer to settle to Mr. Duddy, but he did not respond. PSAMF ¶ 235; DRPSAMF ¶ 235. Also that day, Ms. Davis, sent Attorney Duddy a letter incorporating Ms. Carney's previous settlement demand, requesting conciliation, and stating that "[s]ince the statute of limitations runs in less than one month, please respond to this letter no later than **July 17, 2009**." DSMF ¶ 139; POSMF ¶ 139; PSAMF ¶ 236 (emphasis in original); DRPSAMF ¶ 236. At this time, only money—not an injunction—was requested.

DSMF ¶¶ 139, 146; POSMF ¶¶ 139, 146. The MHRC did not suggest that it was either considering or had decided to commence litigation against Sunbury based upon Ms. Carney's allegations. DSMF ¶ 139; POSMF ¶ 139.

Ms. Davis did not hear from Attorney Duddy until July 17th, when she received a telephone message from him stating that he could not respond to her July 2 letter until July 27, 2009.[21] PSAMF ¶ 237. Attorney Duddy informed Ms. Davis that an agreement was unlikely so long as Ms. Carney persisted in her demands, but that Sunbury was willing to continue negotiating and could probably agree to settle for a lesser amount. DSMF ¶ 139; POSMF ¶ 139; DRPSAMF ¶ 237.

On July 22, MHRC's Counsel, John Gause, told Ms. Davis that he would be out of the office the following week and that the complaint must be mailed by July 27 to meet the August 1 statute of limitations.[22] PSAMF ¶ 238. Ms. Davis

---

[21] Sunbury objects to the Plaintiffs' Additional Statement of Material Fact number 237, arguing that it is inadmissible hearsay and does not comply with the "best evidence" rule since the Plaintiffs did not provide the actual recording of the message. DRPSAMF ¶ 237 (citing FED. R. EVID. 1002 ("To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress.")). The Plaintiffs respond that the phone message is not hearsay as it is not offered for the matter asserted but for its effect on Ms. Davis and, in any event, would be admissible as a party admission. *Pls.' Response to Def.'s Req. to Strike Certain Pls.' Opposing Statement of Material Facts* ¶ 237 (Docket # 83) (*Pls.' Response to* DRPSAMF). Further, they argue that the original phone message is not required because it no longer exists. *Id.* (citing FED. R. EVID. 1004(1) ("The original is not required, and other evidence of the contents of a writing, recording, or photograph is admissible if . . . [a]ll originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith")). The Court overrules Sunbury's hearsay objections since the statement of fact is the admission of a party opponent and in any event is not offered for the truth of the matter asserted. The Court overrules Sunbury's best-evidence objection since there is no evidence, and Sunbury does not claim, that the recording was destroyed in bad faith.

[22] Sunbury objects to the Plaintiffs' Additional Statement of Material Fact number 238 as inadmissible hearsay and otherwise denies it because the statute of limitations would have expired on August 16, 2009. DRPSAMF ¶ 238. The Plaintiffs counter that the statement is admissible as non-hearsay evidence since they offer it to show its effect on Ms. Davis and not for the truth of the matter asserted. *Pls.' Response to* DRPSAMF ¶ 238. The Court overrules Sunbury's objections since the statement is offered to show its effect on Ms. Davis. As regards the question of the date on which

determined that conciliation of the complaints would not be possible before the expiration of the statute of limitations and, on July 22, she sent Sunbury's counsel a letter stating, "Please be advised that, because of the pending statute of limitations deadline of August 1, 2009, the Commission has little choice but to consider conciliation efforts to be unsuccessful at this time." DSMF ¶ 141; POSMF ¶ 141; PSAMF ¶¶ 239, 240; DRPSAMF ¶¶ 239, 240. As of July 22, settlement negotiations had been ongoing for less than twenty days. DSMF ¶ 142; POSMF ¶ 142.

Between July 22 and August 4, 2009, Attorney Duddy does not recall receiving any communication from either the MHRC or Ms. Carney's attorney regarding the settlement. DSMF ¶ 143; POSMF ¶ 143. On August 4, Sunbury's counsel received an email from Mr. Gause with an attached copy of the complaint, which had been filed on July 29, 2009. DSMF ¶ 144; POSMF ¶ 144. Attorney Gallie signed the Complaint on July 23rd and Attorney Gause did so on July 27th. DSMF ¶ 144; POSMF ¶ 144. This email was the first time Attorney Duddy learned that MHRC intended to sue in its own capacity based upon Ms. Carney's allegations. DSMF ¶ 146; POSMF ¶ 146. The Complaint demanded injunctive relief, which had not previously been part of Ms. Carney's demand. DSMF ¶ 145; POSMF ¶ 145.

## II.    DISCUSSION

### A.    Intersection of State and Federal Law

---

the statute of limitations would have run, the Court need not resolve it; at issue is what the MHRC believed, not what was legally the case.

Counts I, II and III allege violations of state and federal human rights laws. Because the state laws closely track their federal counterparts, the Court applies the judicial analysis of the federal laws to the state laws.[23] *See, e.g., Forrest v. Brinker Intern. Payroll Co.*, 511 F.3d 225, 228 n.1 (1st Cir. 2007) (applying a litigant's "MHRA claim and Title VII claim concurrently"); *Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 312 (1st Cir. 2003) ("It is settled law that the MHRA should be construed and applied along the same contours as the ADA."); *Kropp v. Me. Sch. Admin. Union # 44*, Civil No. 06-81-P-S, 2007 WL 551516, at *14 (D. Me. Feb. 16, 2007) ("[T]he Maine Law Court has held that, with respect to a plaintiff's entitlement to damages under the Maine Human Rights Act in a case concerning public accommodation, the standard to be applied to a claim for damages is to be guided by federal precedent concerning the ADA"); *French v. Bath Iron Works Corp.*, 45 F. Supp. 2d 69, 74 (D. Me. 1999) ("When interpreting the MHRA, it is, in fact, appropriate to refer to federal law interpreting the ADEA"); *Winston v. Me. Technical Coll. Sys.*, 631 A.2d 70, 74–75 (Me. 1993) ("[B]ecause the MHRA generally tracks federal anti-discrimination statutes, it is appropriate to look to federal precedent for guidance in interpreting the MHRA"); *Lerman v. Mt. Sinai Cemetery Ass'n, Inc.*, No. CIV.A. 99-613, 2001 WL 1711516, at *4 (Me. Super. Feb. 28, 2001) ("The use of Title VII case law is appropriate as an aid in interpreting this anti-discrimination provision of the Maine Human Rights Act").

### B.   Motion to Strike

---

[23] There are rare exceptions to this general proposition. *See Whitney Wal-Mart Stores, Inc.*, 2006 ME 37, ¶ 27, 895 A.2d 309, 315–16. However, the parties have not suggested that there are any differences between federal and state law that would be decisive in resolving the pending motions.

On August 16, 2010—after discovery closed on May 28, 2010, and during briefing on Sunbury's dispositive motions—the Plaintiffs supplemented their expert disclosure for Judy Shepard-Kegl, Ph.D.    *Def.'s Mot. to Strike* Attach. 1 (*Pls.' Supplemental Expert Witness Disclosure*):

> In addition to the opinions identified in Plaintiffs' original Designation, Plaintiffs expect Judy Shepard-Kegl, Ph.D. to offer at trial the opinions expressed in her Affidavit, dated August 3, 2010, and submitted as an attachment to Plaintiffs' Opposing Statement of Material Facts in this case.  The bases for Dr. Shepard-Kegl's opinions are identified in her report, attached to Plaintiffs' original Designation, her deposition testimony, and in her Affidavit.  In addition, with respect to her opinion concerning Shirley Carney's ability to communicate effectively without an interpreter with John "Dutch" Stephens on August 16, 2007, Dr. Shepard-Kegl will be presented during her testimony with facts or data from the evidence submitted at trial concerning the circumstances of that office visit.

*Id.* at 1.

On September 1, 2010, Sunbury moved to strike the Plaintiffs' supplemental expert witness disclosure.  *Def.'s Mot. to Strike*.  The gravamen of Sunbury's motion is that the Plaintiffs' Supplemental Expert Witness Disclosure, more than six months after the deadline for expert witness disclosure and more than three months after the close of discovery, was not based on a change in the Plaintiffs' condition or the discovery of new information and thus violates Rule 26(a)(2).  *Id.* at 2–3. Specifically, Sunbury says on May 28, 2010, when it deposed Dr. Shepard-Kegl, she testified that she "admitted to not having an opinion about that office visit specifically, but only about Ms. Carney's ability to communicate generally." *Id.* at 3. Sunbury asserts that Dr. Shepard-Kegl's report was equally silent.  *Id.* at 4. Sunbury complains that now that "the central legal issue to be decided at trial is

whether Ms. Carney could communicate effectively without an ASL interpreter with her medical provider . . . on August 16, 2007," Ms. Shepard-Kegl has volunteered an opinion on the matter. *Id.* at 3–4, 6. Sunbury protests that it has been "blindsided" by this "after-the-fact bait and switch of its expert's opinion" and urges the Court to strike the supplemental disclosure. *Id.* at 7.

The Plaintiffs dispute Sunbury's characterization of the supplemental disclosure, viewing it as "a permissible refinement of Dr. Shepard-Kegl's previously disclosed opinions," and rejecting Sunbury's claims of prejudice. *Pls.' Opp'n to Mot. to Strike* at 2.

It is correct that if a supplemental expert disclosure presents a new theory of the case, the district court has the discretion to exclude it and if it represents a refinement, the expert should be allowed to testify. *Compare Global Naps, Inc. v. Verizon New England Inc.*, 603 F.3d 71, 91–92 (1st Cir. 2010) (affirming a district court's exclusion of a supplemental expert declaration filed one week before trial that "presented a new theory that differed from the expert's earlier affidavit"), *with Martinez-Serrano v. Quality Health Servs. Of P.R., Inc.*, 568 F.3d 278, 283 (1st Cir. 2009) (excluding testimony where newly offered expert testimony "amounted to the propagation of a brand-new theory, not merely a refinement of an existing theory"). However, here the supplemental designation states only that the expert may adjust her testimony to the evidence presented at trial. This is neither unusual nor unexpected, and is a variation of the proponent's obligation to make continuing expert disclosures. In other words, even if the Plaintiffs did not file this

supplemental designation, once at trial, their expert (and Sunbury's) will be expected to react to duly admitted testimony to the extent it affects their expert opinions. During trial, experts are frequently asked to apply their general opinions to evolving fact patterns. If the trial testimony itself violates a party's disclosure obligations, it is another matter and it may be subject to exclusion. But the Court rejects Sunbury's attempt to exclude expert testimony on the assumption that trial evidence will so substantially differ from what has been previously disclosed that the evidence and the expert opinion based on that evidence must be excluded.

The Court denies Sunbury's motion to strike the supplemental designation.

### C. Motions *in Limine*

The Plaintiffs and Defendant submitted dueling motions *in limine* seeking exclusion of the other's expert witness. Specifically, the MHRC moves to exclude Sunbury's expert witness, John W. "Dutch" Stephens—the physician's assistant who oversaw Ms. Carney's medical care—because he is not qualified to offer expert opinion on Ms. Carney's ability to communicate effectively with and without an ASL interpreter. *Pl.'s Mot.* in Limine at 1, 3. Sunbury, meanwhile, moves to exclude the Plaintiffs' expert witness, Dr. Shepard-Kegl, "on the grounds that her testimony will not reliably assist the trier of fact to determine a fact in issue" and that her opinions "are not the result of reliable principles and methods." *Def.'s Mot to Exclude* at 1. Because the outcome of these motions impacts the Court's consideration of certain statements of material fact and, thus, the outcome of Sunbury's motions for summary judgment, the Court addresses the motions *in limine* first. *See Hall v.*

*Home Depot U.S.A., Inc.*, Civil No. 09-277-P-H, 2010 U.S. Dist. LEXIS 111272, at *9–10 (D. Me. Sept. 14, 2010) ("Because both Home Depot and the plaintiff cite Mr. Flynn's testimony in connection with the motion for summary judgment, I address that motion [to exclude expert testimony] first.").

### 1. Legal Standard

Under the Federal Rules of Evidence:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702. Under this Rule, "it is the responsibility of the trial judge to ensure that an expert is sufficiently qualified to provide expert testimony that is relevant to the task at hand and to ensure that the testimony rests on a reliable basis." *Beaudette v. Louisville Ladder, Inc.*, 462 F.3d 22, 25 (1st Cir. 2006) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)). The Supreme Court has instructed that, in assessing the expert testimony's reliability and relevancy, "[t]he inquiry . . . is a flexible one," and "[t]he focus must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 594–95.

Evaluation of an expert's reliability is guided by the four non-exclusive *Daubert* factors:

> (1) whether the theory or technique in question can be (and has been) tested;

(2)     whether the theory or technique has been subjected to peer review and publication;

(3)     the theory or technique's known or potential rate of error;

(4)     the level of the theory or technique's acceptance within a relevant scientific community.

*Id.* at 593–94.  The relevancy of an expert's testimony must not only be in accord with Rule 402,[24] but must "assist the trier of fact to understand or determine a fact in issue."  *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998).  That is, to be relevant, expert testimony "requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."  *Daubert*, 509 U.S. at 591–92.

> ### 2.     Defendant's Motion *in Limine* to Exclude Dr. Shepard-Kegl's Testimony Regarding Ms. Carney's General Auditory and Communicative Abilities

Sunbury directs this Court to two rulings which, according to Sunbury, stand for the proposition that "[a]n expert who expresses a general opinion but fails to apply that opinion to the relevant facts of the case cannot reliably assist the trier of facts to understand the evidence or to determine a fact in issue."  *Def.'s Mot to Exclude* at 2.  First, in *Chadwick v. Wellpoint, Inc.*, 550 F. Supp. 2d 140 (D. Me. 2008), *rev'd in part on other grounds*, 561 F.3d 38 (1st Cir. 2009), in connection with a case involving sexual discrimination in the workplace, this Court considered the admissibility of expert testimony on sex-based stereotyping and the meaning of certain words.  The Court excluded the testimony, concluding that "it would be

---

[24] "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible." FED. R. EVID. 402.

improper to allow the plaintiff's expert, who is not familiar with [the employer-supervisor], her background, or her semantic usage, and who has not even read [the] deposition, to testify what [the person] meant." *Id.* at 145. Second, in *Piche v. Nugent*, 436 F. Supp. 2d 193 (D. Me. 2006), this Court excluded expert testimony that the decedent's use of a motorcycle helmet would more likely than not have prevented his death. The expert cited general trends in motorcycle accident data but could not determine the facts relating to the decedent's impact and so could not connect the studies to the specific facts of the case. *Id.* at 209–10. The Court concluded that the studies and the accident reconstruction "are not a reliable foundation from which to predict through the benefit of hindsight that a helmet would more likely than not have prevented [the decedent] from experiencing [death or brain injury]." *Id.* at 210.

Sunbury's reliance upon both cases is misplaced. In *Chadwick* and *Piche*, the Court excluded the expert testimony because the experts had failed to connect their general knowledge to the facts in the case. Here, however, there is no such disconnect. Unlike *Chadwick* and *Piche*, Dr. Shepard-Kegl's opinion is based upon her extensive examination of Ms. Carney. *Aff. of Judy A. Shepard-Kegl, Ph.D.* ¶ 2–58 (Docket # 64) (*Shepard-Kegl Aff.*). Moreover, the Plaintiffs have now filed a supplemental disclosure that addresses Sunbury's objection and relates Dr. Shepard-Kegl's generalized expertise to the office visit of August 16, 2007.[25]

---

[25] At oral argument, having reviewed Dr. Shepard-Kegl's occasionally vague answers during her deposition, the Court suggested that the Plaintiffs might wish to further supplement her proposed testimony to relate her general professional opinions to the events of August 16, 2007, and having done so, they might wish to make her available again for a narrowly focused deposition. Sunbury

Therefore, Sunbury's motion to exclude Dr. Shepard-Kegl's testimony regarding Ms. Carney's General Auditory and Communicative Abilities is denied.

### 3. Defendant's Motion *in Limine* to Exclude Dr. Shepard-Kegl's Testimony Regarding Ms. Carney's Reading Level

In addition to objecting to Dr. Shepard-Kegl's testimony generally, Sunbury objects to the specific portion of Dr. Shepard-Kegl's testimony addressing Ms. Carney's reading level. *Def.'s Mot to Exclude* at 7–10. According to Sunbury, Dr. Shepard-Kegl's opinion that Ms. Carney reads at a sub-fourth-grade level is not based on reliable methods. *Id.*

The Plaintiffs respond that Dr. Shepard-Kegl has explained how she arrived at her conclusions about Ms. Carney's reading level. *Pl.'s Opp'n to Mot.* in Limine at 5–9. She presented Ms. Carney with three reading passages: at a twelfth grade level, at a fifth grade level, and an article from a Deaf newspaper. *Id.* at 5–6. She stated that she followed "a standard procedure used by linguists, psycholinguists, as well as writers for determining the grade level of the first two passages, which was to feed them through a word processor, in this case Microsoft Word, which determined the grade level of the passage." *Id.* at 6. Ms. Carney circled the words she did not know. *Id.* Dr. Shepard-Kegl said she has used the same methodology in testing 60 to 80 people over the past ten years. *Id.* She concluded that Ms. Carney could not read the twelve grade level passage and could get words but not the gist of the fifth-grade passage. *Id.* Dr. Shepard-Kegl also presented Ms. Carney with a

---

intimated that, depending on what Dr. Shepard-Kegl said, it might wish to obtain its own linguistic expert. The Plaintiffs asked whether if all this happens, Dr. Shepard-Kegl would be allowed to retest Ms. Carney. The Court will address these additional matters if necessary on timely and appropriate motion.

series of sentences at various grade levels from the Flynt-Cooter Reading Inventory and she concluded based on the results that "there is no question that she is below the 4th grade reading level." *Id.* at 7.

The purpose of the reliability requirement is to "ensure, as a condition of admissibility, that proffered expert testimony rests on a sufficiently trustworthy foundation." *First Marblehead Corp. v. House*, 541 F.3d 36, 41 (1st Cir. 2008) (quoting *Crowe v. Marchand,* 506 F.3d 13, 17 (1st Cir. 2007)). The First Circuit has explained:

> nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*United States v. 33.92356 Acres Of Land*, 585 F.3d 1, 7 (1st Cir. 2009) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). "[T]rial judges may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable." *Id.* (quoting *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.,* 161 F.3d 77, 81 (1st Cir. 1998)).

The state of the record on the question of the reliability of Dr. Shepard-Kegl's opinions about Ms. Carney's reading level is unsatisfactory. Turning to the *Daubert* factors, *see Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) ("[A] trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony."), there is no indication that the techniques Dr. Shepard-Kegl used to assess Ms. Carney's reading level are verifiable by testing, that they have been subjected to peer review, that the error

rates have been calculated or are even ascertainable, and that they are used or accepted by others within the relevant scientific community. *See Daubert*, 509 U.S. at 594–95.

Dr. Shepard-Kegl references her use of the test previously, stating that "I have consistently used the same passages and procedures for the past ten years on the approximately 60 to 80 people on whom I have conducted communication assessments during that time." *Pl.'s Opp'n to Mot.* in Limine at 6. This is not decisive. Dr. Shepard-Kegl does not provide evidence demonstrating that her previous testing was reliable, but brings the Court back to where it began. *See Kumho Tire Co.*, 526 U.S. at 157 (excluding expert testimony where the Court "found no indication in the record that other experts in the industry use Carlson's two-factor test or that tire experts such as Carlson normally make the very fine distinctions . . . to support his conclusions"). At this point, the Court is left with the circular justification that, because Dr. Shepard-Kegl has used the method before— with unknown results—it is appropriate for its use again. The Court cannot determine the reliability of Dr. Shepard-Kegl's methodology based on Dr. Shepard-Kegl's prior use.

At the same time, Dr. Shepard-Kegl's explanations carry the indicia of greater scientific reliability than the Plaintiffs have demonstrated. She is a Professor of Linguistics at the University of Southern Maine, holds a Ph.D. in Linguistics, and is the director of the Signed Language Research Laboratory at USM. *Shepard-Kegl Aff.* ¶ 2. During her career, she has evaluated approximately

125 individuals to determine their need for and ability to use ASL/English interpreting. *Id.* ¶ 4. When she evaluated Ms. Carney on May 20, 2008, she performed testing to assess her ability to communicate in written and spoken English as well as American Sign Language. *Id.* ¶ 7. Among the tests were reading level assessment tests, including the use of a Microsoft Word program and the Flynt-Cooter Reading Inventory. *Id.* ¶¶ 38–41.

It is true that Dr. Shepard-Kegl has not demonstrated the scientific reliability of these methodologies for assessing reading level, but the Court will not assume that she pulled them out of thin air and arbitrarily tested Ms. Carney using novel and untested personal theories. The Court suspects that, given another opportunity, Dr. Shepard-Kegl would be able to justify the scientific reliability of her reading level testing procedures.

Accordingly, the Court dismisses Sunbury's motion *in limine* without prejudice. The Court "concludes that it would benefit from a greater understanding of the foundation for the expert[]'s opinions." *See Samaan v. St. Joseph Hosp.*, No. CV-09-656-B-W, 2010 U.S. Dist. LEXIS 109763, at *13 (D. Me. Oct. 14, 2010). The Court alerts the Plaintiffs, however, that unless they are prepared to present a more convincing case for the reliability of Dr. Shepard-Kegl's reading level testing, her expert testimony on this subject may be excluded at trial.

### 4. Plaintiffs' Motion *in Limine* to Exclude John W. Stephens' Expert Testimony

The Plaintiffs oppose Sunbury's designation of John Stephens as an expert in this case. *Pl.'s Mot.* in Limine at 1. Specifically, they challenge Mr. Stephens'

testimony as to "Ms. Carney's ability to communicate effectively with him using a combination of lip reading, gestures, and writing," and to the "types of and effectiveness of the auxiliary aids provided to Shirley Carney at her appointments." *Id.* According to the Plaintiffs, Mr. Stephens is not qualified to opine on such points, and his opinions are not based upon sufficient facts or data and are not reliable. *Id.* at 2–3.

Sunbury contests the Plaintiffs' contention, arguing first that, in ruling upon the *Plaintiffs' Motion to Strike Defendant's Expert Witness Designation*, the Court already considered Mr. Stephens' testimony regarding Ms. Carney's ability to communicate effectively with Mr. Stephens. *Def.'s Opp'n to Pl.'s Mot.* in Limine at 2. Second, Sunbury says that "Mr. Stephens has the education, training and twenty-four years of experience employing both subjective and medically objective means to evaluate the effectiveness of communications with patients," that his opinion is based upon the twelve years he spent as Ms. Carney's health provider, and that his methods are based upon his "extensive medical experience and best practices in family medicine." *Id.* at 3, 6–7.

Before addressing the Rule 702 issues that the Plaintiffs raise, the Court addresses Sunbury's argument that the Court has already considered and allowed Mr. Stephens' testimony regarding Ms. Carney's ability to communicate with him effectively. *See Pls.' Mot. to Strike Def.'s Expert Witness Designation* (Docket # 19) (*Pls.' Mot. to Strike*); *Order on Pl. MHRC's Mot. to Strike Def.'s Expert Designation* (Docket # 28) (*Order on Pls.' Mot. to Strike*). The Court agrees with the Plaintiffs

that their "prior challenge was to the manner in which Mr. Stephens was designated, not whether he was qualified." *Pl.'s Mot.* in Limine *Reply* at 1. The Motion to Strike stated explicitly that "[a]lthough Plaintiffs expect to challenge whether Mr. Stephens is qualified to testify as an expert on [the effectiveness of Mr. Stephens' communications with Ms. Carney], the [MHRC] does not seek to strike the designation or this testimony based on the nature of the original designation." *Pls.' Mot. to Strike* at 3

Furthermore, in ruling on the motion to strike, the Court never considered whether Mr. Stephens' designation as an expert was appropriate. Rather, the Court's focus was entirely upon the timing and scope of the disclosure, not on what those opinions would be, or their basis. *Order on Pls.' Mot. to Strike* at 3 ("At this late date Sunbury should be able to provide further information concerning the various opinions Stephens holds regarding auxiliary aids. They have not done so, not even in response to the motion to strike."). The Court rejects Sunbury's contention that it already ruled on the question of Mr. Stephen's Rule 702 expertise.

Turning to the substance of the Plaintiffs' Rule 702 Motion, the Court first assesses Mr. Stephen's qualifications to testify as to the effectiveness of the communications between him and Ms. Carney. In so doing, the Court looks to his "knowledge, skill, experience, training, or education." *See Pages-Ramirez v. Ramirez-Gonzalez*, 605 F.3d 109, 114 (1st Cir. 2010) (quoting *Mitchell v. United States*, 141 F.3d 8, 14 (1st Cir. 1998)); *Santos v. Posadas De P.R. Assocs., Inc.*, 452 F.3d 59, 64 (1st Cir. 2006) ("The test is whether, under the totality of the

circumstances, the witness can be said to be qualified as an expert in a particular field through any one or more of the five bases enumerated in Rule 702— knowledge, skill, experience, training, or education."). The Court's "gatekeeping function requires [it] to determine, given the proffered expert's background, whether the scientific, technical, or other specialized knowledge he offers 'will assist the trier better to understand a fact in issue.'" *Gaydar v. Sociedad Instituto Gineco-Quirurgico y Planificacion Familiar*, 345 F.3d 15, 24 (1st Cir. 2003) (quoting *United States v. Alzanki*, 54 F.3d 994, 1005 (1st Cir. 1995)).

The First Circuit has made clear that testifying experts need not "be 'blue-ribbon practitioners' with optimal qualifications." *United States v. Vargas*, 471 F.3d 255, 262 (1st Cir. 2006) (quoting *United States v. Mahone*, 453 F.3d 68, 71 (1st Cir. 2006)); *Levin v. Dalva Bros., Inc.*, 459 F.3d 68, 78 (1st Cir. 2006) ("[E]xpert witnesses need not have overly specialized knowledge to offer opinions."); *Santos v. Posadas de P.R. Assocs., Inc.*, 452 F.3d 59, 63 (1st Cir. 2006) ("[E]xperts come in various shapes and sizes; there is no mechanical checklist for measuring whether an expert is qualified to offer opinion evidence in a particular field."). Within the medical context in particular, the First Circuit has held that "[t]he proffered expert physician need not be a specialist in a particular medical discipline to render expert testimony relating to that discipline." *Gaydar*, 345 F.3d at 24. "Indeed . . . it would be an abuse of discretion to exclude testimony that would otherwise 'assist the trier better to understand a fact in issue,' simply because the expert does not have the

specialization that the court considers most appropriate." *Pages-Ramirez*, 605 F.3d at 114 (quoting *Gaydar*, 345 F.3d at 24–25).

The Court concludes that, as a Physician's Assistant, Mr. Stephens has the expertise to express the opinions for which he has been designated. *See Adams v. N. New Eng. Tel. Operations, L.L.C.*, No. 08-296-B-W, 2009 U.S. Dist. LEXIS 80473 *42 (D. Me. Aug. 27, 2009) ("There is nothing inherently unacceptable or unreliable about letting a nurse practitioner or a physician assistant articulate and discuss psychiatric conditions that they encounter and treat in the course of their practice."); *Akerson v. Falcon Transp. Co.*, No. CV-06-36-B-W, 2006 U.S. Dist. LEXIS 84870, at * 16–17 (D. Me. Nov. 21, 2006) (allowing a Physician's Assistant to testify about the cause and treatment of a cervical strain). In addition to his training and expertise, Mr. Stephens was the primary medical caregiver for Ms. Carney for twelve years and the Court concludes his expert understanding of her ability to communicate would be helpful to the factfinder. At the same time, Mr. Stephens does not claim to be an expert in deafness. *Def.'s Opp'n to Pl.'s Mot.* in Limine at 5. The Plaintiffs are, of course, free to object at trial if Mr. Stephens' testimony veers into areas beyond his designated expertise and they may explore on cross-examination any limits to Mr. Stephens' more specific training and expertise in the assessment of the ability of deaf persons, including Ms. Carney, to communicate.

### D. Dispositive Motions

#### 1. Rule 12(b)(6) and Summary Judgment Standards

"In ruling on a motion to dismiss, a court must accept as true all the factual allegations in the complaint and construe all reasonable inferences in favor of the plaintiffs." *Alt. Energy, Inc. v. St. Paul Fire. & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001). Sunbury is entitled to dismissal under Rule 12(b)(6) "only if it 'appears to a certainty that the [Plaintiffs] would be unable to recover under any set of facts.'" *State St. Bank and Trust Co. v. Denman Tire Corp.*, 240 F.3d 83, 87 (1st Cir. 2001) (quoting *Roma Constr. Co. v. aRusso*, 96 F.3d 566, 569 (1st Cir. 1996)).

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).[26] For summary judgment purposes, "'genuine' means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party, and a 'material fact' is one which might affect the outcome of the suit under the governing law." *Buchanan v. Maine*, 469 F.3d 158, 166 (1st Cir. 2006) (quoting *Seaboard Sur. Co. v. Town of Greenfield*, 370 F.3d 215, 218–19 (1st Cir. 2004)) (internal quotation marks omitted). "Neither conclusory allegations [nor] improbable inferences are sufficient to defeat summary judgment." *Carroll v. Xerox Corp.*, 294 F.3d 231, 236–37 (1st Cir. 2002) (citation and internal quotation marks omitted).

### 2. Conceded Points

---

[26] On December 1, 2010, while this motion was pending, an amended version of Rule 56 of the Federal Rules of Civil Procedure became effective. *See Farmers Ins. Exch. v. RNK, Inc.*, No. 09-2524, 2011 U.S. App. LEXIS 1255, at *8 n.4 (1st Cir. Jan. 21, 2011). Applying the amended version of Rule 56 to this case is "just and practicable" and would not "work a manifest injustice" because the amendments "do not change the summary judgment standard or burdens." *Id.*

The Plaintiffs have conceded some points. Ms. Carney does not oppose Sunbury's motion for dismissal as to her Count II and that portion of Count III in which she requests an injunction. *Carney Opp'n to Dismiss* at 1. Further, she does not oppose Sunbury's motion for summary judgment on her Count IV. *Carney Opp'n to Summ. J.* at 11. The Court therefore grants Sunbury's motions as to the entirety of Counts II and IV and as to that portion of Count III in which Ms. Carney requests injunctive relief. Finally, because Ms. Carney no longer seeks injunctive relief, *Carney Opp'n to Dismiss* at 1, the Court grants Sunbury's motion to dismiss as to that portion of Count I in which she seeks an injunction.

Rejecting Sunbury's contention that the MHRC's right to injunctive relief is circumscribed by the injunctive relief that is available to Ms. Carney individually, the MHRC says that it may seek an injunction broader than available to Ms. Carney, individually. *MHRC Opp'n to Dismiss* at 2. Accordingly, the MHRC "consents to Sunbury's Motion to the extent that it seeks to dismiss the claim for injunctive relief specific to Ms. Carney," but "opposes Sunbury's Motion . . . to the extent it seeks dismissal of the Commission's remaining claim for injunctive relief." *Id.*

The Court considers Sunbury's motions as they relate to the MHRC and Ms. Carney's Count I and to Ms Carney's request for compensatory damages under Count III.

### 3. Jurisdiction

Before proceeding to Sunbury's motions under Rules 12(b)(6) and 56, the Court considers Sunbury's Rule 12(b)(1) motion to dismiss Counts I and III on the ground that the Court "lacks the subject matter jurisdiction necessary to hear the Plaintiffs' claim for injunctive relief under the MHRA . . . and the RA because the Plaintiffs have failed to plead 'a real and immediate threat of repeated future harm.'" *Def.'s Mot. to Dismiss* at 3; *Deniz v. Municipality of Guaynabo*, 285 F.3d 142, 149 (1st Cir. 2002) ("When a court is confronted with motions to dismiss under both Rules 12(b)(1) and 12(b)(6), it ordinarily ought to decide the former before broaching the latter."); *Arcadian Health Plan, Inc. v. Korfman*, No. 1:10-CV-322-GZS, 2010 U.S. Dist. LEXIS 133003, at *7 (D. Me. Dec. 14, 2010) (same).

### a.       Rule 12(b)(1) Standard

"A motion to dismiss an action under Rule 12(b)(1) . . . raises the fundamental question whether the federal district court has subject matter jurisdiction over the action before it." *United States v. Lahey Clinic Hosp., Inc.*, 399 F.3d 1, 8 n.6 (1st Cir. 2005) (citation omitted). "In ruling on a motion to dismiss for lack of subject matter jurisdiction under [Rule] 12(b)(1), the district court must construe the complaint liberally, treating all well-pleaded facts as true and indulging all reasonable inferences in favor of the plaintiff." *Aversa v. United States*, 99 F.3d 1200, 1209–10 (1st Cir. 1996). "[T]he plaintiff bears the burden of demonstrating that the court has jurisdiction." *Hendrick v. Almar, Inc.*, Civil No. 09-139-P-S, 2009 U.S. Dist. LEXIS 66666, at *1 (D. Me. July 26, 2009) (citing *Aversa*, 99 F.3d at 1209); *Dubois v. United States Dep't of Agric.*, 102 F.3d 1273,

43

1281 (1st Cir. 1996) ("The burden falls on the plaintiff clearly to allege facts demonstrating that he is a proper party to invoke federal jurisdiction." (citation and internal quotation marks omitted)). "[T]he court may consider whatever evidence has been submitted, such as the depositions and exhibits submitted in this case." *Aversa*, 99 F.3d at 1209–10; *Dynamic Image Techs., Inc. v. United States*, 221 F.3d 34, 37 (1st Cir. 2000) ("The court, without conversion, may consider extrinsic materials and, to the extent it engages in jurisdictional factfinding, is free to test the truthfulness of the plaintiffs allegations.").

A Court's subject matter jurisdiction may be challenged facially or factually.[27] *Torres-Negron v. J & N Records, LLC*, 504 F.3d 151, 162 (1st Cir. 2007). "Facial attacks on a complaint 'require the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in [plaintiff's] complaint are taken as true for purposes of the motion.'" *Id.* (quoting *Scarfo v. Ginsberg*, 175 F.3d 957, 960 (11th Cir. 1999)). Factual challenges require a more labor-intensive, two-part inquiry. *Torres-Negron*, 504 F.3d at 162.

---

[27] The First Circuit has provided guidance for determining whether a motion to dismiss presents a facial or factual challenge:

> The general rule . . . is that a pleading's allegations of jurisdiction are taken as true unless denied or controverted by the movant. Thus, if the movant fails to contradict the pleader's allegation of subject matter jurisdiction in his motion to dismiss [for lack of subject matter jurisdiction], then he is presumed to be challenging the pleading's sufficiency under Rule 8(a)(1), and the allegations of the pleading pertaining to jurisdiction are taken as true. But if the movant, either in his motion or in any supporting materials, denies or controverts the pleader's allegations of jurisdiction, then he is deemed to be challenging the actual existence of subject matter jurisdiction, and the allegations of the complaint are not controlling.

*Torres-Negron*, 504 F.3d at 162 n.8. (quoting 5C. CHARLES ALAN WRIGHT, ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1363, at 653–54 (1969)).

First, the Court determines whether the facts relevant to jurisdiction "also implicate elements of the plaintiff's cause of action." *Id.* at 163. If so, the district court assesses the motion by way of the summary judgment standard. *Id.* ("[W]here the jurisdictional issue and substantive claims are so intertwined the resolution of the jurisdictional question is dependent on factual issues going to the merits, the district court should employ the standard applicable to a motion for summary judgment." (internal punctuation and citations omitted)). That is, "where the relevant facts are dispositive of both the 12(b)(1) motion and portions of the merits, the trial court should grant the motion to dismiss only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id.* (internal quotation marks and citation omitted). Should the plaintiff present evidence showing that the relevant facts are genuinely disputed, the case proceeds to trial and the jurisdictional dispute will be reevaluated once the factfinder has resolved the issues of fact. *Id.* "Second, if the facts relevant to the jurisdictional inquiry are not intertwined with the merits of the plaintiff's claim . . . 'the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case.'" *Id.* (quoting *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)).

### b.    MHRC's Standing

In its motion to dismiss, Sunbury says that once Ms. Carney admitted that she does not intend to return to Sunbury for any future medical care, she and (by extension) the MHRC lost standing to pursue a claim for injunctive relief against

Sunbury. *Def.'s Mot. to Dismiss* at 3–6. As Ms. Carney concedes that she has no standing to pursue an injunction, the issue narrows to whether, once Ms. Carney has lost standing, the MHRC loses its standing to pursue injunctive relief. Sunbury points to language in the MHRA that authorizes the MHRC to sue "for the use of the victim of the alleged discrimination or of a described class." *Id.* at 5. It reasons that because the MHRC failed to describe a class and stated that it was bringing the action for the use of Shirley Carney, the MHRC's standing to claim injunctive relief in her name fell with Ms. Carney. *Id.* at 5–6.

The MHRC responds that even though Ms. Carney admits that "she does not intend to return to any medical office operated by Sunbury Primary Care and is no longer seeking injunctive relief," *Carney Opp'n to Dismiss* at 1, an action for injunctive relief under the MHRA may be based on its ability to demonstrate that Sunbury committed acts of unlawful discrimination against Ms. Carney. *MHRC Opp'n to Dismiss* at 3–4. The MHRC quotes *Maine Human Rights Commission v. City of Auburn,* 425 A.2d 990, 995 (Me. 1981):

> [T]he [MHRC], having proved that unlawful discrimination has existed in the Auburn police hiring process, is entitled to positive action on the City's part to assure the future elimination of any unlawful bias anywhere in that process.

*Id.* Addressing Sunbury's contention that once Ms. Carney's right to injunctive relief was extinguished, the MHRC's right was similarly extinguished, the MHRC points to paragraph 23 of the Complaint:

> Plaintiffs have no plain, adequate or complete remedy at law to fully redress the wrongs alleged, and Defendant is likely to perpetrate similar acts on others unless it is enjoined by the Court.

*Id.* at 2–3 (quoting *Compl.* ¶ 23). The MHRC says that this allegation placed Sunbury on notice that it was seeking an order enjoining Sunbury from committing discriminatory acts in the future. *Id.* at 4.

In reply, Sunbury says that the MHRC "fails to offer compelling arguments as to how it can seek injunctive relief on behalf of . . . 'other Sunbury patients who are deaf'" who were not part of Ms. Carney's charge or part of the lawsuit." *Def.'s Reply to MHRC Opp'n to Dismiss* at 6. After oral argument, Sunbury further briefed this case by filing a letter with the Court.[28] *Def.'s Letter* (Docket # 90). The letter argued that if the Court allowed the MHRC's claim for injunctive relief, the Court "would be retaining jurisdiction over a claim that is based on a purely unsubstantiated and hypothetical injury to other patients" and would be allowing the MHRC to perform "an end run around its statutory requirements." *Id.* at 3.

A party seeking injunctive relief must show a threat of irreparable future harm. *Nat'l Tank Truck Carriers, Inc. v. Burke*, 608 F.2d 819, 824 (1st Cir. 1979) ("[T]he prime prerequisite for injunctive relief is the threat of irreparable future harm . . . ." (internal citation omitted)). The requirement exists because an injunction is intended to forestall future violations, not to punish past ones. *Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 304 (1st Cir. 2003) (explaining that injunctive relief under the ADA "requires some ongoing harm (or, at least, a colorable threat of future harm)"); *Fiedler v. Ocean Props., Ltd.*, 683 F. Supp. 2d 57, 73 (D. Me. 2010) (same). An organization may have standing solely as the representative of its

---

[28] The subsequent letter is not provided for in the local rules. However, the Court's legal conclusions remained unaltered even after carefully reviewing the letter so the Court does not address whether the Plaintiffs should be given an opportunity to file their own post-hearing brief.

members. *Council of Ins. Agents & Brokers v. Juarbe-Jimenez*, 443 F.3d 103, 108 (1st Cir. 2006). Generally, organizational standing is valid where "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). As to the first prong, Ms. Carney had standing to bring suit because the Complaint is sufficient to infer allegations of future harm.[29] *Compl.* Turning to the second and third prongs, the statutory text confirms that the MHRC's decision to file suit is statutorily authorized and consistent with the MHRC's mission. *See* 5 M.R.S. §§ 4613(1), 4552. In fact, the statute does not require Ms. Carney's participation in the MHRC's action. *See* 5 M.R.S. § 4613(1) (stating that "[a]ny person aggrieved by the alleged discrimination *may* intervene" in an action brought by the MHRC (emphasis added)).

More specifically, a government agency has standing to sue on behalf of those it is statutorily authorized to represent though the agency itself did not suffer injury. *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 333–34 (1977); *see*

---

[29] That Ms. Carney now professes no intent to return to Sunbury does not affect the conclusion that, as of the filing of the complaint, she had standing. *See Mangual v. Rotger-Sabat*, 317 F.3d 45, 58 (1st Cir. 2003) ("The existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed" (quoting *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830 (1989))). Rather, in light of Ms. Carney's admission, the issue of standing morphs into one of mootness. *Steir v. Girl Scouts of the USA*, 383 F.3d 7, 15 (1st Cir. 2004) ("[T]he doctrine of mootness can be described as 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" (quoting *Becker v. Fed. Election Comm'n*, 230 F.3d 381, 387 n.3 (1st Cir. 2000))). Even if the claim is reconsidered as one of mootness, now that Ms. Carney has no likelihood of future harm from Sunbury, the allegations in the Complaint—specifically paragraph 23—are sufficient to withstand a mootness argument against the MHRC's current demand for injunctive relief.

*also Procurador De Personas Con Impedimentos v. Municipality of San Juan*, 541 F. Supp. 2d 468, 471–73 (D. P.R. 2008) ("A government protection and advocacy agency may have organizational standing where its constituents constitute the functional equivalent of members").  The Court concludes that the Complaint and MHRA show that disabled citizens of Maine, whom the MHRC is statutorily charged with representing, may be considered the functional equivalent of members.  *See Fed. Election Comm'n v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 483–85 (1985) (concluding that the Federal Election Commission was statutorily granted standing to bring a declaratory judgment action to test the constitutionality of an election law on behalf of voters); *Hunt*, 432 U.S. at 334 (concluding that a state agency "is not on that account precluded from asserting the claims of [individuals] since for all practical purposes [the agency] performs the functions of a traditional trade association"); *Procurador De Personas Con Impedimentos v. Municipality of San Juan*, 541 F. Supp. 2d 468, 472 (D. P.R. 2008) ("The statutes governing [the organization's] operations and the allegations in the . . . complaint reveal sufficient indicia of a membership organization to permit [the organization] to file suit on behalf of the specialized segment of society it seeks to represent"); 13B CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 3531.11 (3d ed. 2010) ("Standing to pursue the general interests of the public is easily recognized when federal officials responsible for enforcing specific statutory schemes bring suit under the aegis of the statute").

The Court agrees with the MHRC that the Maine Human Rights Act grants it standing to pursue injunctive relief against a discriminating entity such as Sunbury. In *Auburn*, dealing with an employment discrimination case, the Maine Supreme Judicial Court pointed out that the Maine Human Rights Act "declares the legislative policy demanding the end of unlawful sex discrimination and its consequences in employment." 425 A.2d at 995. The state has adopted the same policy to prevent discrimination for the physically disabled. *See* 5 M.R.S. § 4552 (declaring it to be the policy of the state of Maine "to prevent discrimination . . . on account of physical . . . disability"). Maine law authorizes the MHRC to file suit "seeking such relief as is appropriate, including temporary restraining orders" if it "finds reasonable grounds to believe that unlawful discrimination has occurred, and further believes that irreparable injury or great inconvenience will be caused the victim of such discrimination, or to members of a . . . physical . . . disability . . . group if relief is not immediately granted . . . ." 5 M.R.S. § 4612(4)(A). The Maine Human Rights Act expressly authorizes the MHRC to bring a civil action in its name "for the use of the victim of the alleged discrimination or of a described class" and for courts to "grant relief as in other civil actions for injunctions." 5 M.R.S. § 4613(1). If the court finds that unlawful discrimination has occurred, the Act allows the courts to issue an "order to cease and desist from the unlawful practices specified in the order." 5 M.R.S. § 4613 (2)(B)(1).

As the Maine Supreme Judicial Court said in *Auburn* and as § 4613(2)(B)(1) contemplates, the MHRC may pursue injunctive relief against an entity based on

past discrimination in order to prevent future discrimination against other similarly situated persons. In this case, the MHRC assumes the burden to demonstrate the need for injunctive relief based on Sunbury's actions against only Ms. Carney but this is a matter of proof, not a matter of Article III standing.

The Court denies Sunbury's motion to dismiss the MHRC's claims for injunctive relief.

### 4. Violation of the Maine Human Rights Act

The Plaintiffs' first claim alleges "unlawful public accommodations discrimination" in violation of the Maine Human Rights Act, 5 M.R.S. § 4592(1). *Compl.* ¶¶ 24–26. Sunbury makes two arguments in favor of its summary judgment motion, both leading to the conclusion that the Plaintiffs "cannot prove Ms. Carney was 'excluded, denied services, segregated, or otherwise treated differently than other individuals,'" *Def.'s Summ. J. Mot.* at 3. First, Sunbury says that there is no evidence that it took any adverse action against Ms. Carney. *Id.* at 6. Second, it says that there is no evidence that Sunbury failed to take steps to ensure that Ms. Carney was not denied service as a result of its refusal to provide an ASL translator. *Id.* at 7. The Plaintiffs dispute both of these points. *MHRC's Opp'n to Summ. J.* at 5–13; *Carney Opp'n to Summ. J.* at 2 (incorporating as her own the MHRC's memorandum as to Sunbury's motion for summary judgment on Count I).

Before addressing Sunbury's evidentiary arguments, the Court first addresses a dispute between the parties concerning the elements necessary to prove liability under section 4592(1)(C). Both parties agree that Plaintiffs must prove,

first, that Ms. Carney is disabled under the ADA (and by extension, the MHRA) and second, that Sunbury privately owns, leases, or operates a place of public accommodation. *Def.'s Summ. J. Mot.* at 5; *MHRC's Opp'n to Summ. J.* at 3. The dispute revolves around the third and fourth elements and whether there even is a fourth element that must be proven. According to Sunbury, the Plaintiffs must show, third, that Sunbury took adverse action against Ms. Carney that was based upon her disability, and fourth, that it failed to take necessary steps to ensure that Ms. Carney was not denied services because Sunbury did not provide her with auxiliary aids or services. *Def.'s Summ. J. Mot.* at 5. The Plaintiffs, meanwhile, say that it must only show that Sunbury discriminated against Ms. Carney by "denying her a full and equal opportunity to enjoy the services defendants provide," and that there is no requirement that it show an "adverse action" in order to establish a violation of § 4592(1)(C). *MHRC's Opp'n to Summ. J.* at 3.

For support, Sunbury cites a single unreported case from the District of Minnesota, *Lindgren v. Camphill Village Minnesota, Inc.*, No. Civ-00-2711-RHK/RLE, 2002 WL 1332796, at *5 (D. Minn. June 13, 2002)); in turn, the Plaintiffs cite a single Second Circuit case, *Camarillo v. Carrols Corp.*, 518 F.3d 153, 156 (2nd Cir. 2008). The parties have not cited, and the Court is unaware of, any First Circuit or state of Maine authority.

There is no clear consensus on whether proof of an adverse action is an element in § 4592(1)(C) (or its federal counterpart), and the Court need not decide the issue here. The Court is convinced that, even if the First Circuit or state of

Maine courts adopted it as an element, its application is not warranted here because Sunbury's failure to provide an ASL translator is the sole alleged act of discrimination. *See Mershon v. St. Louis University*, 442 F.3d 1069, 1077 n.5 (8th Cir. 2006), In *Mershon*, the Eighth Circuit explained that the different formulations (and the inclusion or exclusion of the "adverse action" prong) depend on the nature of the allegation. *Id.* Where "the alleged failure to accommodate is the adverse action and no other act is claimed as discriminatory, there is no requirement to demonstrate any adverse action other than the failure to accommodate itself." *Id.* (distinguishing the required showing for a plaintiff alleging retaliation from one alleging a failure to accommodate).

The Court agrees with the Eighth Circuit's reasoning in *Mershon*. Although the Court in *Mershon* was analyzing the federal counterpart to 5 M.R.S. § 4592(1)(B) (a failure to make reasonable modifications in policies, practices, or procedures, 42 U.S.C. § 12182(b)(2)(A)(ii)) and not the same federal counterpart to the Plaintiff's claim under 5 M.R.S. § 4592(2)(C) (a failure to provide auxiliary aids and services, 42 U.S.C. § 12182(b)(2)(A)(iii)), the Court is convinced that the reasoning in *Mershon* applies with equal force to the latter provision.[30] The requirement of an adverse action is no more or less implied on the face of the statute under subsection (B) than under subsection (C).[31] Moreover, the Court's

---

[30] Sunbury argues in its post-hearing letter that *Mershon* is distinguishable because it interpreted the federal parallel to subsection (B) whereas the present dispute concerns subsection (C). *Def.'s Letter* at 2.

[31] The Court notes that *Lindgren* shares a common lineage with *Mershon*; both rely partially upon *Amir v. St. Louis University*, 184 F.3d 1017 (8th Cir. 1999), which considered an alleged failure to make reasonable modifications in policies, practices or procedures under the federal counterpart to subsection (B).

analysis in *Lindgren*—which Sunbury says supports application of the "adverse action" prong—did not distinguish between proving an "adverse action" and proving the fourth element: "that [the defendant] failed to take the necessary steps to ensure that [the plaintiff] was not denied services because of the absence of auxiliary aids or services." *Id.* at *5–6. Rather, the *Lindgren* court found that the plaintiff made a *prima facie* showing of both elements by simply "identifying an accommodation, the costs of which, facially, do not clearly exceed the benefits." *Id.* at 6. This reasoning strikes the Court as consistent with the Eighth Circuit's proclamation that "the alleged failure to accommodate *is the adverse action*." *Mershon*, 442 F.3d at 1077 n.5 (emphasis added).

The Court turns to the final element: whether Sunbury failed to take necessary steps to ensure that Ms. Carney was not denied services for lack of an ASL translator.[32] Sunbury says that the Plaintiffs "cannot show that Sunbury failed to take steps to ensure that she was not denied services because of the absence of an ASL interpreter on August 16, 2007." *Def.'s Summ. J. Mot.* at 7. In support, Sunbury points to evidence it says "reveals that Sunbury took the necessary steps to ensure that she was indeed able to have sufficient communication so as to have understood, participated in, and benefited from her medical treatment on August 16, 2007, the same as a hearing patient, even though an ASL interpreter was not present." *Id.* According to Sunbury, Mr. Stephens'

_____

[32] The Plaintiffs characterize the inquiry as whether Ms. Carney was denied effective communication. *MHRC's Summ. J. Opp'n* at 5. The Court understands this as a rephrasing of the legal inquiry and not a separate factor to consider. In other words, whether Ms. Carney was denied services—here, treatment by Mr. Stephens—is dependent upon her effective communication with him

twelve years of experience treating Ms. Carney, his "comprehensive knowledge of Ms. Carney's medical history," their prior exchanges of written correspondence via fax, the routine nature of Ms. Carney's visit, Ms. Carney's inability to point to any specific miscommunication, and her successful adherence to her treatment plan, all show that Mr. Stephens was able to communicate effectively with Ms. Carney. *Id.* at 7–8. Finally, Sunbury asserts in its post-hearing letter that Ms. Carney must prove that there was an absence of any auxiliary aids and services, not that Sunbury should have used a *different* auxiliary aid. *Def.'s Letter* at 2–3. It contends that Ms. Carney cannot prove absence because she does not dispute that Sunbury used lip reading, gestures and writing as auxiliary aids. *Id.*

In contrast, the Plaintiffs assert that "[t]he facts show a trialworthy issue that Ms. Carney was denied effective communication by Sunbury . . . ." *MHRC's Opp'n to Summ. J.* at 5. They point to facts such as Ms. Carney's limited ability to read and write, the reduction in communications between Ms. Carney and Mr. Stephens and increased duration of office visits when no ASL translator was present, Dr. Shepard-Kegl's opinion that Ms. Carney needed an ASL translator for effective communication, and Sunbury's December 15, 2006 statement to Ms. Carney that "Sunbury agrees that Ms. Carney needs an accommodation for effective communications during an office visit,"[33] PSAMF ¶ 232. *MHRC's Opp'n to Summ. J.* at 5–13.

---

[33] Sunbury objects to this statement of fact, arguing that there is no evidence that any Sunbury employee other than Mr. Stephens made the decision regarding the need for an interpreter on August 16, 2007" and so the December 2006 statement is not material to the issue of whether Sunbury denied Ms. Carney access to medical services in August 2007 and further that Ms. Carney's

The Court need not linger on the issue. Simply put, the Plaintiffs have adduced numerous issues of fact which, viewed in the light most favorable to them, could lead a jury to conclude that Ms. Carney could not effectively communicate with Mr. Stephens during her August 16, 2007 office visit. Whether Ms. Carney's difficulties reading and writing were sufficiently severe as to limit her understanding of Mr. Stephens' medical explanations; the degree to which Mr. Stephens could understand Ms. Carney's gesticulations and handwriting and Ms. Carney could understand Mr. Stephens lip movements and handwriting; the extent to which the August 16, 2007 appointment differed medically from a regular annual physical; and whether Sunbury had previously acknowledged Ms. Carney's asserted need for an ASL translator—all are issues of fact to be determined by the jury. The Court denies Sunbury's motion for summary judgment as to Ms. Carney's and the MHRC's claims under the MHRA (Count I).

### 5.    Conciliation (MHRC's Count I)

#### a.    The Parties' Positions

Sunbury argues in its motions to dismiss and for summary judgment that the MHRC cannot recover compensatory damages under 5 M.R.S. § 4613 because it failed to provide Sunbury with a full ninety days to engage in conciliation. *Def.'s Mot. to Dismiss* at 10–14; *Def.'s Mot. for Summ. J.* at 15–19. Because the MHRC

---

first complaint to the MHRC is time-barred. DRPSAMF ¶ 232. The Court overrules Sunbury's objection. Independent of who made the decision to deny Ms. Carney an ASL translator on August 16, 2007, Sunbury's previous statements as to her auditory needs are relevant, though not dispositive, of her needs in 2007. Furthermore, whether or not Ms. Carney's prior allegations of discrimination are time-barred is irrelevant to the Court's consideration of Sunbury's prior statements since Ms. Carney does not seek relief based upon earlier instances of discrimination.

declared conciliation a failure twenty-two days after it found reasonable grounds to believe that unlawful discrimination occurred, Sunbury reasons that the MHRC violated the statute's conciliation requirement and lacks standing to bring suit seeking compensatory damages or, in the alternative, MHRC cannot prevail as a matter of law. *Def.'s Summ. J. Mot.* at 16–18.

The MHRC protests that it may file suit before the ninety days lapse if it determines that conciliation efforts have failed, and relies on case law concluding the same. *MHRC's Opp'n to Summ. J.* at 15–16. The MHRC points to the chain of communications between its counsel and Sunbury's as supporting its conclusion that the conciliation had failed. *Id.* at 16–18.

At oral argument, Sunbury expanded its argument. As an adjunct to its argument on standing, Sunbury claimed that when the MHRC made a demand on behalf of Ms. Carney on July 2, 2009, the MRHC was attempting to conciliate for Ms. Carney alone and when Sunbury responded to the demand on July 17, 2007, it was responding only to her demand. Thus, when the MHRC brought suit on July 29, 2009, it was acting solely on behalf of Ms. Carney, and therefore the MHRC is now statutorily limited to those claims that had been raised in the conciliation attempt. Even assuming that Ms. Carney's demands had been conciliated (a fact Sunbury contests), Sunbury says that it never got an opportunity to conciliate the current MHRC demand for injunctive relief. Thus, the MHRC violated 5 M.R.S. § 4622(1)(B), which mandates that before filing a civil action, the plaintiff must allege and establish that the MHRC "failed, within 90 days after finding reasonable

grounds to believe that unlawful discrimination occurred, to enter into a conciliation agreement to which the plaintiff was a party."

In response at oral argument, the MHRC said that Sunbury's argument misapprehends the MHRC's role during conciliation. According to the MHRC, it acts as an intermediary between the parties during this ninety day conciliation period and commonly, if the parties are able to resolve the dispute, the MHRC will abide by their agreement and take no further action against the employer. However, if the parties do not resolve the dispute, the MHRC decides whether to file a civil action pursuant to its authority under 5 M.R.S. § 4612(4).

### b.    The Conciliation Provision

The MHRC is empowered to file suit for use of victims of unlawful discrimination. 5 M.R.S. § 4612(4)(A). However, before doing so, it must engage in a conciliation with the accused. First, "[i]f the commission finds reasonable grounds to believe that unlawful discrimination has occurred . . . it shall endeavor to eliminate such discrimination by informal means such as conference, conciliation and persuasion."[34] 5 M.R.S. § 4612(3). Only when conciliation efforts have not succeeded may the MHRC file suit. 5 M.R.S. § 4612(4)(A) ("[I]f conciliation efforts . . . have not succeeded, the commission may file in the Superior Court a civil action seeking such relief as is appropriate, including temporary restraining orders."). Moreover, when the relief sought by the MHRC includes compensatory damages, it may only file suit if it "alleges and establishes that, prior to the filing of the civil

---

[34] The statute provides an exception for certain emergencies where the Commission is not required to attempt to conciliate. 5 M.R.S. § 4612(3). None of the statutorily defined emergencies applies here. 5 M.R.S. § 4612(4)(B).

action . . . the commission . . . failed, within 90 days after finding reasonable grounds to believe that unlawful discrimination occurred, to enter into a conciliation agreement to which the plaintiff was a party." 5 M.R.S. § 4622.

The statutory language does not support Sunbury's position. The MHRA expressly requires that the Commission "endeavor" to reach agreement; it does not specify further what the Commission must do, other than try. 5 M.R.S. § 4612(4)(A). Furthermore, the statute does not require that before filing suit, the conciliation efforts have "failed"; it requires only that the conciliation efforts have "not succeeded", a lesser standard. *Id.* MHRC Rule 2.09(B) provides only that "[i]f a respondent fails or refuses to confer with the Commission or its representatives, or fails or refuses to make a good faith effort to resolve any dispute, the Commission may terminate its efforts to conciliate the dispute." Me. Hum. Rights Comm'n Reg. § 2.09(B) (2009).

The Court is aware of only one case that addresses Sunbury's argument. In *Robards v. Cotton Mill Assoc.*, 1998 ME 157, ¶ 9, 713 A.2d 952, 955, the Maine Supreme Judicial Court held that the MHRC need not wait the full ninety days after the beginning of conciliation before filing suit. The Court focused on the plain language of section 4622, specifically that an action may be brought when conciliation failed "*within*" ninety days. *Robards*, 1998 ME 157, ¶ 9, 713 A.2d at 955 (emphasis in original). The Court reasoned that "[t]he statutory language does not prohibit a plaintiff from commencing an action before the 90-day period has expired if the Commission, as it did in this case, determines within the 90-day

period that conciliation efforts have failed." *Id.* To the extent Sunbury asserts that the MHRC and Ms. Carney were required to wait the full ninety-day period before filing suit, Maine law holds otherwise.

The Court turns to when during the ninety-day conciliation period the MHRC or a private party may file suit. In interpreting an analogous federal provision, courts have concluded that whether a party may exit early from mandatory conciliation remains tightly bound to the facts of each case. *See E.E.O.C. v. Prudential Fed. Sav. and Loan Ass'n*, 763 F.2d 1166, 1169 (10th Cir. 1985) ("Conciliation is thus a flexible and responsive process which necessarily differs from case to case."). The national trend is to find the conciliation requirement fulfilled where it was conducted in "good faith." *See, e.g., E.E.O.C. v. Hibbing Taconite Co.*, 266 F.R.D. 260, 273–74 (D. Minn. 2009) ("In reviewing the EEOC's conciliation efforts, Courts look to whether the EEOC has conciliated in good faith, and has given the [accused] an 'adequate opportunity to respond to all charges and negotiate possible settlements.'"); *E.E.O.C. v. One Bratenahl Place Condo. Ass'n*, 644 F. Supp. 218, 220 (N.D. Ohio 1986) (same). Specifically, the conciliation requirement is done in good faith when the Commission "outline[s] the basis for its determination of discrimination, offer[s] an opportunity for voluntary compliance, and respond[s] flexibly to the reasonable attitudes of the [accused]." *U.S. E.E.O.C. v. Lockeed Martin Global Telecomms., Inc.*, 514 F. Supp. 2d 797, 806 (D. Md. 2007); *E.E.O.C. v. Asplundh Tree Expert Co.*, 340 F.3d 1256, 1259 (11th Cir. 2003) ("To satisfy the statutory requirement of conciliation, the EEOC must (1)

outline to the employer the reasonable cause for its belief that Title VII has been violated; (2) offer an opportunity for voluntary compliance; and (3) respond in a reasonable and flexible manner to the reasonable attitudes of the employer."); *Prudential Fed. Sav. and Loan Ass'n*, 763 F.2d at 1169 (stating that the EEOC must make "a sincere and reasonable effort to negotiate by providing the defendant an 'adequate opportunity to respond to all charges and negotiate possible settlements'").

Moreover, a number of courts have indicated that even less is required, looking generally to whether conciliation was attempted in good faith and avoiding the parties' charges and countercharges about the details of the progress (or lack thereof) of the settlement discussions. *See E.E.O.C. v. Cal. Psychiatric Transitions, Inc.*, 725 F. Supp. 2d 1100, 1114 (E.D. Cal. 2010) ("Courts have generally rejected efforts to challenge conciliation, concluding that the issue is only whether EEOC attempted conciliation, not how hard it actually tried to obtain settlement."); *E.E.O.C. v. Tri-State Plumbing, Heating & Air Conditioning Contractors, Inc.*, 502 F. Supp. 2d 767, 770 (W.D. Tenn. 2007) ("The 'form and substance' of conciliations lies within the discretion of the EEOC and is beyond judicial review. District courts 'should only determine whether the EEOC made an attempt at conciliation.'" (internal citations omitted)). This less interventional standard seems wise.

The Court concludes that the MHRC negotiated in good faith and satisfied the conciliation requirements of the MHRA. Although the impending expiration of the statute of limitations may have influenced MHRC's decision to declare the

conciliations a failure, the MHRC would have been entitled in any circumstance to declare a failure by then. Conciliation efforts began on July 2, 2007—when Fran Davis, the MHRC compliance officer, wrote to Attorney Duddy. DSMF ¶ 139; POSMF ¶ 139. With the expiration of the statute of limitations looming, Ms. Davis did not hear from Attorney Duddy until July 17th, when she received a telephone message from him; Attorney Duddy "communicated to the Commission that it was unlikely Sunbury and Ms. Carney would be able to reach agreement if Ms. Carney was sticking to her demand but Sunbury was willing to continue negotiating and could probably get the matter resolved for a lesser amount."[35] DSMF ¶ 139; POSMF ¶ 139; DRPSAMF ¶ 237. Attorney Duddy informed the MHRC that "he could not respond to her July 2nd letter until July 27, 2009." PSAMF ¶ 237. Aware that the MHRC had to mail the complaint by July 27, 2009 to meet the August 1, 2009 statute of limitations deadline, Ms. Davis of the MHRC concluded that conciliation of the complaints would not be possible before the expiration of the statute of limitations. PSAMF ¶ 238–39.

At this point, the MHRA had fulfilled its obligation to engage in good faith conciliation. It had made a settlement demand on behalf of Ms. Carney, its settlement efforts had "not succeeded," and it was required to file the complaint in a matter of a few days. 5 M.R.S. § 4612(4)(A). As of July 27, 2007, when it mailed the complaint for filing, the MHRC knew: 1) that on July 2, it had made a specific

---

[35] At oral argument, Sunbury repeatedly emphasized that Attorney Duddy said that Sunbury was willing to continue negotiating and could probably get the matter resolved for a lesser amount. True, this is what Mr. Duddy said. However, it is also true that he effectively rejected Ms. Carney's demand and delayed any Sunbury response to a point perilously close to the deadline for the statute of limitations.

demand on behalf of Ms. Carney; 2) that Sunbury waited fifteen days before responding on July 17; 3) that Sunbury rejected the demand; 4) that Sunbury had left the door open for further negotiations; 5) that Sunbury had said it could not respond further until July 27; 6) that to avoid being time-barred, the MHRC had to mail the complaint by July 27; and, 7) that Sunbury delayed responding at all and then, when it responded, delayed further. Because of internal issues within the Commission, the last date that the MHRC could place a complaint in the mail was July 27 and therefore the MHRC mailed the complaint the last possible day. PASMF ¶ 238. The MHRC was not obligated to allow the statute of limitations to pass in order to comply with the statutory conciliation mandate.

That Sunbury made overtures to continue negotiations and raised the possibility of a lower settlement amount did not obligate the MHRC to entertain it. The MHRC was entitled to seek the amount of compensation it felt was justified and to accept nothing less. *See E.E.O.C. v. Supervalu, Inc.*, 674 F. Supp. 2d 1007, 1010 (N.D. Ill. 2009) (concluding that the EEOC satisfied its good-faith conciliation obligations when it rejected an "underwhelming" settlement offer from the defendant). Once this amount was affirmatively rejected by Sunbury, no further negotiations were required. *See One Bratenahl Place Condo. Ass'n.*, 644 F. Supp. at 219 ("[A]fter an employer rejects an offer made by the E.E.O.C., the E.E.O.C. has no further duty to conciliate.").

Sunbury says in its post-hearing letter that the fault of the failed conciliation lies with the MHRC because, if it "were truly intent on achieving a conciliation of

the matter prior to August 1, 2009, it could have asked Sunbury for a tolling agreement." *Def.'s Letter* at 6. As stated *supra*, the Court takes a less interventional approach and, aside from assessing good faith, will not probe the details of the settlement discussions. Nonetheless, even if the Court were to consider the form and substance of the conciliation, it would conclude that the MHRC was under no obligation to attempt to extended negotiations. Having once received Sunbury's explicit rejection of its requested settlement amount, the MHRC did not have to continue discussions in the hope that Sunbury might later change its mind.

### c. The Roles of the MHRC

The Court rejects Sunbury's contention that since the MHRC failed to conciliate its separate potential interest in an injunctive relief within the ninety day period, it is barred from claiming equitable relief. Sunbury cites no statutory support for its contention and it defies the structure of the statute, which strikes a decided preference for informal resolution, and the multiple roles of the MHRC.

Turning first to the Act's preference for informal resolution, the statute contemplates that a private complainant must first bring a complaint to the MHRC. 5 M.R.S. § 4611. However, after the complaint is filed with the MHRC, the statute says that the MHRC "shall provide an opportunity for the complainant and respondent to resolve the matter by settlement agreement prior to a determination." 5 M.R.S. § 4612(1)(A). Failing resolution, the MHRC is required to investigate the complaint to determine "whether there are reasonable grounds to believe that

unlawful discrimination has occurred." 5 M.R.S. § 4612(1)(A), (B). If the MHRC finds reasonable grounds, the statute requires that the MHRC again "endeavor to eliminate such discrimination by informal means such as conference, conciliation and persuasion." 5 M.R.S. § 4612(3). If conciliation does not succeed, a civil action may follow. 5 M.R.S. § 4612(4), (6).

Under the MHRA, the MHRC has an investigatory and adjudicative role. But it also has a conciliatory role, acting at times as an intermediary between the complainant and the respondent. 5 M.R.S. § 4612(1)(A), (3). Moreover, since it is authorized to bring suit, the MRHC also may assume the role of enforcer. 5 M.R.S. §§ 4612(4)(A), 4613(1). The MHRA's statutory authority to become the investigator, the mediator or the complainant, can be a powerful incentive for informal resolution. By resolving the matter with the private complainant, the respondent often avoids defending a lawsuit with the MHRC as plaintiff. This is no secret.

The MHRC's transformation from conciliator to litigator occurs at whatever point the conciliation does not succeed. During the period of conciliation, it is possible that the MHRC could insert itself in the process and make its own demands of the respondent, but it is not required to do so. The respondent knows that if it fails to settle the claim, it may face not only the complainant but also the Commission as a party plaintiff and if the Commission enters a lawsuit, it has a broader public mission than the narrower personal interests of a private litigant. If the MHRC were required to press its overriding public interest during the

conciliation process, it would compromise its role as mediator and it would make the informal resolution of private disputes more difficult.

Finally, Sunbury's argument is flatly contrary to the confidentiality provisions of the statute. Under 5 M.R.S. § 4612(3), the Act makes it clear that "[e]verything said or done as part of [conciliation] endeavors is confidential and may not be disclosed without the written consent of the parties to the proceeding, nor used as evidence in any subsequent proceeding." To credit Sunbury's position, the Court would be required to examine the conciliation proceedings to determine whether the remedies sought in litigation had been raised in conciliation. Maine law simply does not authorize such a process.

The Court finds no statutory or policy support for Sunbury's argument.

### 6. Standing by Ms. Carney on Claim Under the Rehabilitation Act (Count III)

Ms. Carney persists in her demand for compensatory damages for Sunbury's alleged violations of the Rehabilitation Act, Count III. *Carney Opp'n to Dismiss* at 2. Sunbury argues that her claim for relief should be dismissed for failure to state a claim upon which relief can be granted, Rule 12(b)(6), because she failed to allege that Sunbury engaged in intentional discrimination. *Def.'s Mot. to Dismiss* at 6. Because Sunbury makes the same argument in its motion for summary judgment, the Court considers both motions together.

Ms. Carney's claims under Count III fall under Section 504 of the Rehabilitation Act. Section 504 provides in part, "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or

his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).  Accordingly, Ms. Carney must prove four elements:  "(1) that she is disabled; (2) that she sought services from a federally funded entity; (3) that she was "otherwise qualified" to receive those services; and (4) that she was denied those services "solely by reason of her ... disability." *Lesley v. Hee Man Chie*, 250 F.3d 47, 53 (1st Cir. 2001).  Further, because Ms. Carney claims compensatory damages, she must prove (1) that the discrimination was intentional and (2) "that the type of damages alleged are available as compensatory damages under § 504 . . . ." *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 126 (1st Cir. 2003) ("[P]rivate individuals may recover compensatory damages under § 504 . . . only for intentional discrimination."); *Carmona-Rivera v. Puerto Rico*, 464 F.3d 14, 17 (1st Cir. 2006) ("[N]on-economic damages are only available when there is evidence 'of economic harm or animus toward the disabled.'").

The First Circuit has yet to delineate the standard by which intentional discrimination is measured.  The Maine Supreme Judicial Court adopted the "deliberate indifference standard" in which the plaintiff must show "that a defendant had knowledge that a harm to a federally protected right was substantially likely, and failed to act upon that likelihood."[36] *Scott v. Androscoggin Cnty. Jail*, 2004 ME 143, ¶ 28, 866 A.2d 88, 96 ("We adopt the view expressed in

---

[36] This Court favorably cited *Androscoggin County Jail*, for a related point of law.  *See Kropp v. Me. Sch. Admin. Union # 44*, Civil No. 06-81-P-S, 2007 WL 551516, at *14 (D. Me. Feb. 16 2007) (citing *Scott v. Androscoggin County Jail* for the tenet that Maine courts look to the ADA in considering damages under the MHRA).

*Duval* [*v. Cnty. Of Katsap*, 260 F.3d 1124, 1138–39 (9th Cir. 2001)]*, that, as a prerequisite to recovery under the public entity provisions of the ADA or the MHRA, a plaintiff must show deliberate indifference . . . ."). Both Sunbury and the Plaintiffs advocate in favor of this standard. *Def.'s Mot. to Dismiss* at 8–9; *Carney Opp'n to Dismiss* at 2. The Court need not select between the deliberate indifference and intentional discrimination standards to resolve Sunbury's motions. *See McKay v. Winthrop Bd. of Educ.*, No. Civ. 96-131-B, 1997 WL 816505, at *3 (D. Me. June 6, 1997) (concluding "[w]ithout deciding the exact nature of the intent required to be proved in order to obtain compensatory damages," that the plaintiff would withstand the defendant's motion to dismiss where the complaint alleged acts and omissions that were "intentional, willful, wanton, in bad faith, and/or malicious").

The Complaint alleges that Sunbury agreed "that Ms. Carney needs an accommodation for effective communications during an office visit . . . [and] will make arrangements to have a qualified interpreter present during the office visit." *Compl.* ¶ 15. It continues, "Sunbury . . . refuse[d] to provide Plaintiff Carney with an interpreter after August 1, 2007, and Carney found a new medical provider because of Sunbury's refusal to provide her with an interpreter." *Id.* ¶ 21. These two allegations are together sufficient to infer intentional discrimination. The Plaintiffs have adduced a great deal of evidence showing that, without an interpreter, Ms. Carney could not effectively communicate with Mr. Stephens about the medical issues from which she was suffering.

The absence of an interpreter apparently created obstacles for both Mr. Stephens and Ms. Carney, since both admit that "a typical office visit with Ms. Carney without an interpreter would have lasted approximately a half hour, which was twice as long as a comparable visit for a hearing patient with the same problems." DSMF ¶ 72; POSMF ¶ 72. Further, Ms. Carney had previously written to Mr. Stephens after her first appointment with him that "I was not quite getting it and that I really needed an interpreter. I repeated this on probably three to five different occasions." POSMF Attach. 1 ¶ 10 (*Carney Aff.*). Whether, in light of Mr. Stephen's knowledge of Ms. Carney's auditory abilities, Sunbury's refusal to provide an interpreter could be viewed as intentional, is a matter also to be determined at trial. The Court denies Sunbury's motion to dismiss and motion for summary judgment as to the question of intentional discrimination under the RA.

## III. CONCLUSION

The Court ORDERS as follows:

1) The Court DENIES Plaintiff Maine Human Rights Commission's Motion *in Limine* to Exclude Testimony By Defendant's Expert Witness (Docket # 31);

2) The Court DENIES Defendant Sunbury Primary Care, P.A.'s Motion to Strike Plaintiffs' Supplemental Expert Witness Disclosure (Docket # 81);

3) The Court DISMISSES without prejudice Defendant Sunbury Primary Care, P.A.'s Motion to Exclude Expert Testimony Under Federal Rules of Evidence 702 (Docket # 46);

4) The Court GRANTS in part and DENIES in part Defendant Sunbury Primary Care, P.A.'s Partial Motion to Dismiss (Docket # 47) and Defendant Sunbury Primary Care, P.A.'s Motion for Summary Judgment (Docket # 48). The Court DISMISSES Shirley Carney's claim for injunctive relief in Count I of the Complaint. The Court DISMISSES Count II of the Complaint in its entirety. The Court DISMISSES Shirley Carney's claim for injunctive relief in Count III of the Complaint. The Court DISMISSES Count IV of the Complaint in its entirety. Otherwise, the Court DENIES Defendant Sunbury's motions to dismiss and for summary judgment.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 14th day of March, 2011